[No. 200,983-2. En Banc.]
Argued May 3, 2012. Decided August 2, 2012.

*In the Matter of the Disciplinary Proceeding Against* PAUL
E. SIMMERLY, *an Attorney at Law.*

*Kurt M. Bulmer*, for the attorney.

*Joanne S. Abselson*, for the bar association.

¶1 Owens, J. — The Washington State Bar Association (WSBA) charged Paul E. Simmerly with 36 counts of attorney misconduct stemming from his mishandling of client funds. The most egregious count involves making false representations and fabricating evidence during the disciplinary process. The hearing officer ultimately recommended suspension after finding that the WSBA had proved 26 of the 36 counts. On review, the WSBA Disciplinary Board (Board) affirmed the hearing officer's findings but modified his decision in a few ways. First, it reinstated five counts involving the misuse of client funds based solely on the hearing officer's findings. More importantly, the Board recommended disbarment in lieu of suspension for Simmerly's intentional misrepresentations during the disciplinary investigation.

¶2 Simmerly asks this court to reject the Board's recommendation as well as many other factual findings made by the hearing officer. We affirm Simmerly's disbarment because the findings are supported by substantial evidence and Simmerly is unable to identify any clear reason to depart from the Board's unanimous recommendation.

## I. FACTS

¶3 The WSBA began investigating Simmerly in 2007 after it was notified of overdrafts in his trust account. These overdrafts caused the WSBA to audit Simmerly's trust account for the period from January 1, 2006, through March 31, 2008. The WSBA's investigation uncovered numerous violations of the Rules of Professional Conduct (RPC),

including errant trust account practices and a pattern of misusing client funds. During the course of its investigation into these practices, the WSBA opened a second grievance against Simmerly for similar conduct but with different clients. The WSBA eventually charged Simmerly with 36 counts of ethical violations for these practices: 34 related to his misuse of client funds, one related to his failure to cooperate, and one related to his misrepresentation and fabrication of evidence during the investigation.

A. Trust Account Practices (Counts 1-10)

¶4 The first 10 counts[1] all revolve around Simmerly's poor trust account practices. As stated above, the WSBA's auditor, Rita Swanson, audited Simmerly's account for the period of January 1, 2006, through March 31, 2008. On February 15, 2007, Simmerly withdrew $4,500 from his trust account even though he was not entitled to all of that money. Similarly, he withdrew $200 on February 21, 2007, even though he was not entitled to those funds. These withdrawals were due, in part, to his self-described "seat of the pants" accounting. Decision Papers (DP) at 5 (Findings of Fact, Conclusions of Law and Hr'g Officer's Recommendation (FFCL) ¶ 2). Had he maintained proper accounting measures, he would have been aware that these funds were not his to withdraw.

¶5 Simmerly's negligent bookkeeping took various forms. He maintained an inaccurate handwritten check register and client ledgers that were inaccurate and incomplete. The ledgers were incomplete, completely missing some client transactions, inaccurately recording others, and actually including some transactions that never even occurred. Often, he would leave off, among other things, the date or purpose of the transaction and the check number of the disbursement. Further, rather than properly balance his check register, Simmerly would simply replace the check

---

[1] Count 11 was withdrawn by the WSBA before the proceeding began.

register balance with the bank statement balance. Such actions rendered the check register ineffective at guarding against shortages. Simmerly also did not identify the client matter next to several transactions. The hearing officer found that Simmerly's practices combined to result in potential injury for some clients and actual injury for others.

¶6 Throughout the audit period, Simmerly was also receiving earned fees from ARAG, a prepaid insurance company, which he deposited into his trust account. ARAG made these payments for telephone consultations Simmerly had with ARAG clients. Specifically, on December 28, 2005, he deposited $6,977.50 of ARAG payments into his trust account. A few days later, he had disbursed only $714.00 of those funds to his law partner. Later, in January 2006, Simmerly deposited an additional $4,789.50 from ARAG into his trust account. The hearing officer found that these actions resulted in Simmerly commingling his funds with client funds in the trust account.

¶7 Altogether, for counts 1 through 10, the hearing officer found that Simmerly's actions violated former RPC 1.14 (2002), RPC 1.15A, and RPC 1.15B.

B. Misuse of Client Funds (Counts 12-34)

¶8 Simmerly was also charged with misusing client funds belonging to eight different clients.

*Theron Jaquez (Counts 12-17)*

¶9 Simmerly represented Jaquez in 2005 for a parenting plan and orally agreed to a $200 per hour fee. Jaquez had prepaid legal insurance through ARAG, a legal insurer, but was uncertain if it would cover the full cost of representation, so he paid $2,500 in advance. Simmerly argued this payment was a retainer and not an advance fee deposit. The hearing officer found Simmerly's testimony not credible and found this payment was an advance fee deposit. The distinction is an important one.

■ ■ ¶10 A retainer "is a fee that a client pays to a lawyer to be available to the client during a specified period," and the fee belongs to the lawyer upon receipt (i.e., the fee is not placed in trust). RPC 1.5(f)(1). It "must be agreed to in a writing signed by the client." *Id.* In contrast, an advanced fee deposit must be placed into trust and typically exists absent a signed writing to the contrary. *Id.* cmt. 12, at 81. The fee was not a retainer here because Jaquez believed the funds would not be used unless ARAG refused to pay. Simmerly deposited the $2,500 directly into his general account in October 2005 despite not billing Jaquez for any work or working enough hours for it. Regardless, Simmerly used $1,000 of those funds by the end of the day.

¶11 After some additional work, Simmerly eventually sent a $6,700 bill to Jaquez on November 1, 2005, but the bill did not justify Simmerly's handling of the $2,500. Moreover, ARAG paid Jaquez's bill in full, thereby precluding any reason to use the $2,500. ARAG paid with two checks, a $2,680 check dated November 9, 2005, and a $4,020 check dated November 10, 2005. Simmerly properly deposited the first check into his general account and the second check into his trust account. In February 2006, he removed the $4,020 from the trust account. He was entitled to only $1,520 of the $4,020 because of the previously deposited $2,500 check from Jaquez.

¶12 It was not until 2007, when Simmerly billed Jaquez for $6,750 in additional work from 2007 that the $2,500 advance fee deposit became an issue. In response to the bill, Jaquez claimed a $2,500 credit from the advance payment. Simmerly disputed Jaquez's credit, claiming he had record of only two payments: one from Jaquez ($2,500) and one from ARAG ($2,680). However, Simmerly did in fact have records of all three payments. Regardless, Simmerly continued to deny that ARAG had made the $4,020 payment.

¶13 Eventually, in January 2008, Simmerly filed a lawsuit against Jaquez alleging $10,141.71 in unpaid legal fees

and costs and some prejudgment interest. Simmerly continued to deny that ARAG had made two payments, and even after Jaquez provided proof in May 2008 of the payment, Simmerly still did not amend his complaint. On the first day of that trial in June 2008, Simmerly finally acknowledged the ARAG payment after receiving Jaquez's proposed exhibits. After acknowledging the payments, Simmerly sought only $4,260, the principal amount from the 2007 services with the $2,500 credit applied. The hearing officer found that Simmerly had violated former RPC 1.14(b), RPC 1.15A(f), former RPC 1.4 (1985), RPC 8.4(c), and RPC 1.5(a).

## Debra Dahl (Counts 18-21)

¶14 Dahl was being sued by her former fiancé in February 2007 and hired Simmerly to represent her. They orally agreed to a $200 hourly fee that required a $2,500 payment up front. On the subject line of the check, Dahl stated the payment was for "attorney retainer." Ex. A-200. However, Dahl understood that the payment was to function as an advance as it was not to be used until earned. The hearing officer found that Simmerly's testimony to the contrary was not credible and found that the payment was indeed an advance.

¶15 Simmerly improperly deposited the advance payment directly into his general account even though he had yet to bill any work. The hearing officer noted that Simmerly had only $10 in his general account at the time of the deposit and that Simmerly used half of the payment by the next day. The hearing officer further found that Simmerly knew or should have known that he was acting improperly.

¶16 On May 26, 2007, Dahl sent a cost advance of $300, which Simmerly deposited into his general account even though he had not spent $300 of his own funds on behalf of Dahl. Simmerly then sent his first bill in August 2007 for $3,339. No charges in the bill justified Simmerly depositing

the initial $2,500 into his general account. Dahl paid $5,000 to cover the bill and provide a $1,661 advance. Simmerly deposited the entire check into his general account.

¶17 Then, in December 2007, Dahl fired Simmerly by e-mail after the judge ruled against her on a partial summary judgment motion. Simmerly acknowledged being fired but did not cease working on the matter because a motion for sanctions against both Dahl and Simmerly under CR 11 was pending. However, Simmerly's response to the sanctions was for himself only. He told Dahl via e-mail that she was on her own since she had fired him.

¶18 Dahl hired another attorney to appear at the CR 11 sanction hearing, and she eventually decided that she would not contest the judge's ruling on partial summary judgment. Instead, she filed for chapter 13 bankruptcy in May 2008. In October 2008, Simmerly submitted a proof of claim in her bankruptcy proceeding claiming $16,459 in unpaid work. The hearing officer found that Simmerly knew he was not entitled to this sum, as $8,280 worth of the bill was incurred from work *after* Dahl had fired him.

¶19 Based on the above actions, the hearing officer found Simmerly had violated RPC 1.15A(e), RPC 1.5(a), RPC 3.3(a), and RPC 8.4(c).

*Terence Johnson (Counts 22-24)*

¶20 Johnson hired Simmerly in July 2005 to handle paternity and parenting plan issues. Johnson agreed to a $200 per hour fee and paid $5,000 that was not to be used until Simmerly worked on the case. The hearing officer found this payment was an advance fee deposit and rejected Simmerly's testimony otherwise. Simmerly deposited the $5,000 directly into his general account even though he had not billed any work nor worked 25 or more hours on Johnson's case. At the time he deposited the $5,000, Simmerly had less than $200 in his general account and, within a month, he used most of the $5,000.

¶21 Johnson fired Simmerly in early August 2005 and requested a refund of unearned fees. At this point, Johnson had still not received an accounting of how the $5,000 had been handled. Three months later, Simmerly finally billed Johnson for $3,140 for the period between July 2005 and August 2005, and he sent a refund from his trust account for $1,860. By writing this check, Simmerly increased the shortage of client funds in his trust account because he had never placed any of Johnson's funds into the trust account to begin with.

¶22 The hearing officer found that these actions violated former RPC 1.14(b)(3) and (4).

*Selena Rushton (Counts 25-28)*

¶23 Simmerly began representing Rushton in an employment matter around June 2006, replacing her former attorney. The hearing officer found that Simmerly and Rushton orally agreed to a one-third contingent fee basis and that Simmerly never put it in writing. The hearing officer found Simmerly's contrary testimony was not credible because his own ledger card for the case listed the case as "contingent." DP at 16 (FFCL ¶ 96); Ex. A-247.

¶24 Rushton's case settled in March 2007, and Simmerly received a $57,500 settlement check, which he deposited into his trust account. The next day, he disbursed $20,000 worth of the settlement funds to himself even though he had not yet provided any accounting to Rushton. Further, Rushton had not agreed to this distribution. A few days after this, Rushton e-mailed Simmerly asking for an update on the payment process. In his reply, Simmerly inaccurately listed the settlement as $56,500. He also listed his discounted fees as $22,250 and his undiscounted fees as $25,000, more than one-third of the settlement. He did not explain how he had reached the undiscounted fee of $25,000 nor did he list the amount of hours he worked. Rushton agreed. The hearing officer found that Rushton agreed to this e-mail accounting and the excess fee because she simply wanted to be done with the matter.

¶25 Simmerly disbursed $34,250 of the settlement funds to Rushton on March 29, 2007. A few weeks later, he disbursed $23,250 to himself, more than 40 percent of the settlement and $1,000 more than he had previously said his fee was. One-third would have been $19,166.66. The hearing officer found Simmerly knew he was taking more than a one-third contingency. But the hearing officer also found that Simmerly did not know he was taking $1,000 more than he had represented. In fact, it was not until the WSBA began investigating Simmerly and noticed the mistake that Simmerly became aware of it. At that point, Simmerly contacted Rushton and eventually paid an additional $500 on August 12, 2008. Ultimately, the hearing officer concluded that Simmerly had violated RPC 1.15A(d) and (e) and RPC 1.5(a), (b), and (c).

*Aaron Buerman and Scott Evans (Count 29)*

¶26 Simmerly represented Buerman and Evans in April 2004 to recover funds paid for construction of a custom boat. Buerman and Evans entered into a written one-third contingency fee agreement with Simmerly. Simmerly eventually obtained a $41,750 settlement that was paid between February and December 2005. These payments were placed into Simmerly's trust account. The final payment of $12,750 was deposited into his trust account on December 30, 2005, but Simmerly never told his clients he received this final payment. Simmerly admitted he was entitled to only $289 of this particular payment.

¶27 It was not until Buerman e-mailed Simmerly complaining and asking for an update on March 1, 2006, that Simmerly told Buerman he had received the final payment. In the interim period, Simmerly disbursed to himself two checks, one on January 20, 2006, for $2,500 and the other on February 15, 2006, for $4,000. He was not entitled to $6,211 of those funds, and he had used almost all of those funds by March 8, 2006. The hearing officer found that Simmerly's testimony regarding why he withdrew the money was not

credible and that Simmerly knew or should have known he was not entitled to it.

¶28 Finally, on March 14, 2006, Simmerly sent his clients an accounting and their final settlement check of $12,461. He then transferred $6,250 from his general account to his trust account to ensure he could cover the final check. These acts constituted a violation of former RPC 1.14(a).

*Heidi Lea (Count 30)*

¶29 Lea hired Simmerly in March 2006 to represent her in a dissolution matter. They orally agreed to a $200 per hour fee, and Lea paid Simmerly $2,500, reasonably assuming the funds would not be used until earned. As he did with his other clients, Simmerly deposited the $2,500 into his general account even though he was not entitled to it. When Lea and her husband decided to not divorce in late 2006, Lea fired Simmerly and requested a refund. That same day, Simmerly sent, by certified mail, his first billing statement listing his total expenses as $1,174.64 and stating that Lea was entitled to a $1,325.36 refund. She never received the bill, and Simmerly never re-sent it.

¶30 Concerned about the refund, Lea eventually called Simmerly to ask about it in May 2007. Simmerly sent the refund check dated May 3, 2007, from his trust account even though he knew that he had never deposited any of Lea's funds into his trust account. This caused an overdraft in his trust account. Despite finding the above facts, the hearing officer did not find that these acts violated the RPCs.

*Kay Michael Larsen (Counts 31-32)*

¶31 Larsen hired Simmerly in July 2006 to represent him in a dissolution matter and orally agreed to a $200 per hour fee. Larsen paid a $2,500 advance to Simmerly's partner, Robert Kaufman, which was deposited into Kaufman's trust account. Larsen believed the funds would be used as Simmerly worked on the case. Kaufman billed only

$450 to Larsen. Kaufman then gave the remaining $2,050 to Simmerly who was handling the matter. Simmerly deposited it into his trust account but immediately withdrew the funds without informing Larsen. The hearing officer found this violated RPC 1.15A(e).

*Dominique Glaub (Counts 33-34)*

¶32 Simmerly represented Glaub in June 2007 on a real estate matter. They entered a written fee agreement for a $200 per hour rate. Under the agreement, Glaub was required to pay a $3,000 "retainer" that Simmerly would deposit into his trust account. The funds were to be used for fees earned and billed by Simmerly. Additionally, Simmerly had to wait three business days after mailing an invoice before withdrawing funds. Glaub paid the advance and Simmerly deposited it into his trust account.

¶33 Six days later, Simmerly withdrew the $3,000 from his trust account and deposited it into his general account even though he had neither worked sufficient hours for the fee nor billed any work for Glaub. The hearing officer found that this withdrawal was improper as the agreement had not been amended. Ultimately, however, the hearing officer found that the WSBA had not proved by a clear preponderance of the evidence that any RPCs were violated.

C. Failure To Cooperate and Fabrication of Evidence (Counts 35 and 36)

¶34 In May 2007, when the WSBA began its investigation of Simmerly over the overdraft notice related to Johnson's 2005 refund check, Simmerly responded with the following explanation:

> "The overdraft was caused by a math error I made. An error was made when I paid out funds to a client in an amount that did not have costs deducted that had been incurred on behalf of the client. An incorrect, lesser figure for the check was recorded and that figure had the costs deducted that had been incurred on behalf of the client. The shortage was immediately corrected."

DP at 23 (FFCL ¶ 151) (quoting Ex. A-111). However, the overdraft was not caused by a math error and no "lesser figure" was ever recorded. No such transaction existed.

¶35 The audit manager was confused by Simmerly's response about this "math error" and wondered how a check written in 2005 was not cashed until 2007. Moreover, she wondered how such an error was not caught during monthly reconciliations throughout that period. The audit manager requested additional information related to the investigation on May 31, 2007, to answer these questions. She then sent another letter on June 7, 2007, requesting an explanation of another overdraft notice related to Lea's refund check.

¶36 Simmerly did not respond within the requested time, and disciplinary counsel sent a "10-day" letter on July 24, 2007, requesting a response and reminding Simmerly of his obligation to cooperate. *Id.* (FFCL ¶ 156); Ex. A-114. Disciplinary counsel eventually subpoenaed Simmerly on August 16, 2007, because he failed to respond to the WSBA's letters.

¶37 After the deposition, Simmerly provided the WSBA with the requested client ledgers and trust account balances in a letter. In an attachment, he represented the following balances as of January 1, 2006:

| | |
|---|---|
| Penitsch | 777.08 |
| Buerman/Evans | 6,211.00 |
| Johnson | 1,860.00 |
| Lea | 1,325.36 |
| ARAG/Simmerly | 9,122.12 |

DP at 24 (FFCL ¶ 160); Ex. A-118 (sealed document) at 2. The represented balances, however, were false. As of January 1, 2006, Penitsch's account had no funds, Buerman's had $12,750, Johnson's had no funds, and Lea's had no funds. In fact, Lea was not even a client as of January 1, 2006.

¶38 The WSBA followed up with more letters requesting additional information. If Simmerly responded at all to these letters, he did so without answering all questions asked. In fact, it was his inadequate responses to the WSBA's requests that eventually led it to open another grievance, WSBA File No. 09-00629. *See* DP at 26 (FFCL ¶¶ 174, 175). This second grievance involved Simmerly's handling of Buerman's and Evans' settlement funds and later expanded to include his handling of clients Lea, Larsen, and Glaub.

¶39 The hearing officer ultimately concluded that Simmerly acted intentionally and knowingly with regard to his misrepresentations to the WSBA. He found that Simmerly's deception caused actual injury to the disciplinary system by causing the WSBA to expend substantial time reconstructing his trust account. Further, the hearing officer concluded that Simmerly's misrepresentations during the disciplinary process injured the public and the legal system as a whole. He also found that Simmerly "acted with both a dishonest and a selfish motive." *Id.* at 29 (FFCL ¶ 193). Simmerly's actions violated both RPC 8.4(*l*) and (c).

## II. PROCEDURAL HISTORY

¶40 After a five-day hearing in late 2010, the hearing officer concluded the WSBA had proved 26 counts: 1-10, 14-17, 19, 21, 23-29, 32, and 35-36. Applying the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992), the hearing officer concluded that Simmerly should be suspended for 24 of the counts and reprimanded for 2. The hearing officer found five aggravating factors, including (1) "dishonest or selfish motive," (2) "a pattern of misconduct," (3) "multiple offenses," (4) "refusal to acknowledge wrongful nature of conduct," and (5) "substantial experience in the practice of law." DP at 37 (FFCL ¶ 233). The only mitigating factor was the "absence of a prior disciplinary record." *Id.* (FFCL ¶ 234). Ultimately, the hearing officer recommended suspending Simmerly for one year.

¶41 On automatic review, the Board unanimously affirmed the hearing officer's findings of fact but modified the hearing officer's decision in three ways. First, it reinstated counts 12, 13, 18, 22, and 33 (all relate to Simmerly's misuse of client funds). Second, it stated that the presumptive sanction for count 36 was disbarment, not suspension. And third, it recommended disbarring Simmerly for count 36.

¶42 Counts 12, 13, and 22 all involved violations of former RPC 1.14(a) based on Simmerly placing his clients' advance fee deposits into his general account instead of his trust account. The Board did not make any additional findings of fact but relied instead on the findings made by the hearing officer. For example, with respect to count 12, the hearing officer had found that Simmerly deposited the $2,500 advance fee deposit from Jaquez into his general account even though he had not billed any work at that time. The hearing officer also found that Simmerly "knew or should have known that he was dealing improperly with $2,500 at the time he deposited it." DP at 10 (FFCL ¶ 37). According to the Board, these findings were sufficient to prove count 12 by a clear preponderance of the evidence.

¶43 Counts 18 and 33 similarly involved improper use of client funds and involved violations of RPC 1.15A(b), (c), and/or (h)(3). Again, the hearing officer had found sufficient facts to support these counts. With respect to count 18, the hearing officer found that Simmerly knew or should have known that he was improperly depositing Dahl's advance fee deposit into his general account. As for count 33, Simmerly withdrew Glaub's $3,000 advance fee from the trust account without billing Glaub for any work even though he knew or should have known it was improper. Accordingly, the Board reinstated these two counts.

¶44 Finally, the Board recommended disbarment based on Simmerly's intentional misrepresentations to the WSBA during the disciplinary process. The Board concluded that Simmerly's actions "caused serious injury or potential in-

jury to the public and the legal system as a whole, which is seriously harmed by lawyers who make misrepresentations during the course of disciplinary investigations." DP at 45 (Disciplinary Board Order Modifying Hr'g Officer's Decision (Board's Order) at 7). Based on this recharacterization, ABA *Standards* standard 7.1 applied instead of standard 7.0, which raised the recommended sanction to disbarment.

¶45 Simmerly then appealed the Board's decision to this court, challenging its entire decision as well as numerous findings and conclusions made by the hearing officer. Specifically, Simmerly challenges the following counts:

Count 36

> By making one or more misrepresentations in providing information to ODC [(WSBA Office of Disciplinary Counsel)] during its investigation of WSBA File No. 07-00804, Respondent violated RPC 8.4(c) and/or RPC 8.4(*l*).

Count 5

> In early 2006, by commingling non-client funds with client funds in his trust account, Respondent violated former RPC 1.14(a).

Count 21

> By filing a proof of claim in Dahl's bankruptcy case for an amount in excess of what she owed to him, Respondent violated current RPC 1.5(a), current RPC 3.3(a), and/or RPC 8.4(c).

Count 35

> By failing to provide prompt responses to one or more of ODC's requests regarding WSBA File No. 07-00804 and/or WSBA File No. 09-00629, Respondent violated RPC 8.4(*l*), by failing to comply with his duty to cooperate under ELC 5.3(e).

DP at 2-4 (FFCL at 2-4). Simmerly also challenges numerous factual findings and the Board's ultimate decision that he be disbarred.

## III. ISSUES

¶46 A. Does substantial evidence support the challenged findings?

¶47 B. Is disbarment the proper sanction?

## IV. ANALYSIS

■■ ¶48 This court has the ultimate responsibility for disciplining lawyers. *In re Disciplinary Proceeding Against Van Camp*, 171 Wn.2d 781, 797, 257 P.3d 599 (2011). We review conclusions of law de novo and will uphold them if they are supported by the findings of fact. *Id.* Considerable weight is given to the hearing officer's findings of fact and "[u]nchallenged findings of fact are treated as verities on appeal." *In re Disciplinary Proceeding Against Marshall*, 160 Wn.2d 317, 329-30, 157 P.3d 859 (2007). We will uphold challenged findings of fact if supported by substantial evidence. *Id.* at 330. "Substantial evidence is evidence sufficient 'to persuade a fair-minded, rational person of the truth of a declared premise.'" *Id.* (internal quotation marks omitted) (quoting *In re Disciplinary Proceeding Against Poole*, 156 Wn.2d 196, 209 n.2, 125 P.3d 954 (2006)). "Even if there are several reasonable interpretations of the evidence, it is substantial if it reasonably supports the finding. And circumstantial evidence is as good as direct evidence." *Rogers Potato Serv., LLC v. Countrywide Potato, LLC*, 152 Wn.2d 387, 391, 97 P.3d 745 (2004) (citation omitted).

A. Whether Substantial Evidence Supports the Challenged Findings

■■ ¶49 "The WSBA must prove misconduct by a clear preponderance of the evidence." *Van Camp*, 171 Wn.2d at 799. A clear preponderance is more than a mere preponderance of the evidence, but less than beyond a reasonable doubt. *Id.* The Board's recommendations will be upheld if supported by substantial evidence. *Id.* at 799-800.

### 1. Count 36—Making Misrepresentations to the WSBA During Its Investigation

¶50 Simmerly argues that he did not make any knowing misrepresentations to the WSBA. Under RPC 8.4(c) and (*l*), an attorney is generally prohibited from making misrepresentations, especially within the context of a disciplinary investigation. *See* RPC 8.4(c), (*l*). The hearing officer found that Simmerly violated both rules and that Simmerly "acted with both a dishonest and a selfish" motive during the investigation. DP at 29 (FFCL ¶ 193). These findings are supported by substantial evidence in the record. Simmerly sent a letter to the WSBA containing false information about the balances in his trust account and supported those false balances with fabricated, handwritten client ledgers. The hearing officer found that these misrepresentations were made intentionally.

¶51 Simmerly believes that in a circumstantial evidence case, such as this one, that his reasonable alternative explanation for the misrepresentation must be disproved before he can be found guilty. Simmerly, however, misunderstands the nature of a circumstantial evidence case. He relies on *In re Disciplinary Proceeding Against Guarnero*, 152 Wn.2d 51, 61, 93 P.3d 166 (2004), where we stated that the WSBA "must produce facts from which only one reasonable conclusion may be inferred." *Guarnero*, however, does not require the WSBA to disprove Simmerly's theory of the case simply because circumstantial evidence is involved. *Guarnero* essentially means that if the hearing officer believes two possible explanations are reasonable, then the WSBA has not met its burden. *See In re Disciplinary Proceeding Against Poole*, 164 Wn.2d 710, 724, 193 P.3d 1064 (2008). The hearing officer is still entitled to make credibility determinations, which we give great weight to, when evaluating an alternative explanation. *Id.* The attorney "must argue why the findings are not supported by the evidence and cite to the record in support of the argument."

*Id.* at 725. If there is conflicting evidence, this court typically will not disturb the findings. *Id.* (citing *In re Disciplinary Proceeding Against Burtch*, 162 Wn.2d 873, 895, 175 P.3d 1070 (2008)). And as stated above, when evaluating evidence, "circumstantial evidence is as good as direct evidence." *Rogers Potato Serv., LLC*, 152 Wn.2d at 391.

¶52 Simmerly's proffered explanation was not reasonable. The basis of his explanation is that his letter to the WSBA "was a best effort . . . to identify whose funds he thought should have been in the account." Opening Br. of Resp't Simmerly (Opening Br.) at 14. However, he never qualified his response to the WSBA with that information. The WSBA's request for that information gives no indication that it merely wanted his "best understanding" of his trust accounts.

¶53 Further, Simmerly's claim that a "math error" caused the initial overdraft is unsupported by the record because no such error existed. DP at 23 (FFCL ¶¶ 151-52); Ex. A-111. Instead, the overdraft resulted from Simmerly partially reimbursing a client's advance fee deposit from his trust account even though the client's deposit was never placed into that account. Simmerly also made false representations about the balances of Penitsch, Buerman, Johnson, and Lea in his trust account as of January 1, 2006. In reality, Penitsch, Johnson, and Lea had no funds in the account while Buerman had double the amount. Simmerly supported these false representations with fabricated handwritten client ledgers that Simmerly attached to his letter.

¶54 Moreover, his claims that he created his client ledgers for the WSBA are inconsistent with his prior deposition testimony where he testified that the ledgers were created contemporaneously with the transactions. Accordingly, Simmerly's alternative explanation is not reasonable, and the hearing officer reasonably found that he acted

intentionally.[2] In sum, there was substantial evidence to support count 36 based on Simmerly's inconsistent statements, his fabricated client ledgers, and inaccurate account balances.

 2. Count 5—Commingling Nonclient Funds with Client Funds

¶55 Former RPC 1.14(a) prevents a lawyer from depositing "funds belonging to the lawyer or law firm" into the trust account containing client funds. Simmerly claims on review that count 5 cannot be sustained because the ARAG funds were not his. To the contrary, however, the ARAG funds belonged to Simmerly and his law partners as evidenced by his own words. Ex. A-122, at 2 ("I need to emphasize here that all the funds ever received from ARAG . . . belonged to us."). Accordingly, the hearing officer properly found the WSBA proved count 5 by a clear preponderance of the evidence.

 3. Count 21—Violations Related to Filing a Proof of Claim in Dahl's Bankruptcy Proceeding in Excess of Amount Owed

¶56 The hearing officer found that Simmerly's filing the proof of claim for an amount in excess of what was owed to him violated RPC 1.5(a), RPC 3.3(a), and RPC 8.4(c). Further, the hearing officer rejected Simmerly's justification for the claim based on quantum meruit. Dahl had fired Simmerly on December 14, 2007. Before being fired, Simmerly had sent only one bill, in August 2007, and it had been paid in full. After being fired, no additional bills were sent to Dahl. Regardless, when Dahl filed for bankruptcy in May 2008, Simmerly filed a proof of claim alleging $16,549 for 90.6 hours of legal work between July 2007 and

---

[2] Simmerly claims that his ultimate production of the documents used to prosecute him is evidence of his innocence. Considering he was required to produce these documents and that he consistently delayed in producing them, his ultimate production is not evidence of his innocence.

May 2008. But 41.4 hours of the work were performed after Simmerly was fired by Dahl. In total, Simmerly billed Dahl $8,280 for work after termination.

¶57 A lawyer may not charge unreasonable fees for his services. RPC 1.5(a). Nor may a lawyer knowingly make false statements of material fact to a tribunal or fail to correct false statements previously made to the tribunal. RPC 3.3(a). Finally, a lawyer may not engage in acts of "dishonesty, fraud, deceit or misrepresentation." RPC 8.4(c). Simmerly's filing of a proof of claim for $8,280 worth of work after termination violates all three of these RPCs. As the hearing officer found, "Respondent knew that he was falsely representing to the court that Ms. Dahl had an obligation to pay him for the time." DP at 28 (FFCL ¶ 189).

¶58 There is no dispute that Dahl fired Simmerly as of December 14, 2007. Simmerly claims instead that Dahl incurred the obligation either through ratification or quantum meruit. Neither applies. First, Simmerly provides no citation to the record to prove that Dahl ratified Simmerly's conduct, and thus we do not consider this argument. *See Marshall*, 160 Wn.2d at 331. Second, quantum meruit does not apply here because Simmerly performed the work for his own benefit, not Dahl's. Simmerly's posttermination work related to potential sanctions against both Dahl *and* Simmerly. As Simmerly makes clear in his e-mails to Dahl after being terminated, he expressly told her that his response "will be for me, personally. Since you have fired me, you are on your own." Ex. A-215. Again, Simmerly provides no citation to the record proving otherwise. His unsupported factual assertions are insufficient to overturn the hearing officer's findings of fact. *Marshall*, 160 Wn.2d at 331.

¶59 Moreover, Simmerly rejected Dahl's request for further representation after December 14, 2007. On December 18, 2007, Dahl e-mailed Simmerly in a panic because she did not have another attorney lined up and needed to have a continuance on her case. She asked that Simmerly file the

continuance on her behalf. Shortly thereafter, Simmerly e-mailed her back, stating, "Once again, I am no longer your attorney. . . . I DO NOT HAVE THE AUTHORITY TO REQUEST A CONTINUANCE FOR YOU." Ex. A-229. Why he thought he had the authority to continue filing motions on her behalf regarding the sanctions but not also file the continuance is unexplained. Accordingly, the hearing officer properly found that the WSBA proved count 21 by a clear preponderance of the evidence.

### 4. Count 35—Failing To Provide Prompt Responses to One or More of ODC's Requests

¶60 The hearing officer found Simmerly violated RPC 8.4(*l*) by failing to promptly respond to 10 separate requests for information. Simmerly does not contest that his ultimate production of the requested information was untimely. In objecting to the hearing officer's conclusion, he claims his delayed responses were the result of his "negligent understanding" of the rules. Opening Br. at 52. But his claim is contradicted by his failure to promptly respond to 10 separate requests for information. Even when the WSBA sent a letter on December 31, 2008, stating that his failure to respond in a timely manner would violate RPC 8.4(*l*), Simmerly still failed to promptly respond to requests. Thus, his claim that he was unaware of his obligations is contradicted by the evidence. We, therefore, uphold count 35 because Simmerly repeatedly failed to respond promptly to the WSBA as required.

### 5. Remaining Counts

¶61 Simmerly next claims he cannot be held responsible for the remaining counts because his behavior was based on "his misunderstanding about retainers and [his] poor record[ ] [keeping]." Opening Br. at 36. Each of these counts relates to Simmerly's misuse of client funds, poor trust account practices, and fee agreements, which involve his handling of the advance fee deposits. He includes counts 12,

13, 18, 22, and 33, the counts reinstated by the Board, in this claim. The counts being challenged here mainly involve former RPC 1.14(a) and RPC 1.15A(c)(1).

¶62 Primarily, he relies on the fact that at the time of his misconduct, "there was a 'void' and a 'vacuum' on guidance on the handling of advance fee deposits." Opening Br. at 36. He claims the WSBA Board of Governors removed ethics opinion 186, which instilled some confusion. But Simmerly neither read nor relied on that opinion. Consequently, the hearing officer did not apply the withdrawal of the opinion "to Respondent's benefit in this matter." DP at 5 (FFCL ¶ 5). Further, because the hearing officer found that the payments were advance fee deposits and not retainers, the withdrawal of the opinion should have had no effect. The hearing officer was justified in finding that the payments were advance fee deposits because the clients testified that the payments were not to be touched until work was performed.

¶63 Simmerly also challenges the hearing officer's finding that Simmerly "knew or should have known" he was misusing client funds. He first argues that the term "should know" is essentially equal to negligence. It is not. Granted, the ABA *Standards* do not define "should know," but it is treated differently from negligence. *Compare* ABA STANDARDS std. 4.12 (recommending suspension if lawyer "should know"), *with* ABA STANDARDS std. 4.13 (recommending reprimand if lawyer was negligent). "Negligence" is " 'the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation.' " *In re Disciplinary Proceeding Against Longacre*, 155 Wn.2d 723, 743-44, 122 P.3d 710 (2005) (quoting ABA STANDARDS at 7).

¶64 Simmerly repeatedly ignored his agreement with his clients that their payments would not be used until earned. Two acts in particular stand out. First, Simmerly had a written hourly fee agreement with Glaub that stated ex-

plicitly that Simmerly had to submit a bill to Glaub for fees earned before removing funds. But he ignored this requirement and removed funds from his trust account even though he had not billed any work. Second, Simmerly continued his unethical accounting despite being "embarrassed and shocked" by his mishandling of Buerman's funds in 2005. 5 Verbatim Tr. of Proceedings at 984. These acts demonstrate that beyond failing to heed a substantial risk of harm, Simmerly essentially had constructive knowledge of it. Accordingly, substantial evidence supports the hearing officer's finding that Simmerly "knew or should have known" he was misusing client funds.

### 6. Conversion and Credibility

¶65 Simmerly also challenges the hearing officer's use of the word "convert" and the hearing officer's credibility determinations. Neither challenge is persuasive. First, Simmerly argues that the hearing officer did not find that Simmerly criminally converted or intentionally converted client funds. While true, it is also irrelevant. The hearing officer found that Simmerly "knew or should have known that he was acting improperly in converting client funds from his trust account." DP at 27 (FFCL ¶ 182) (counts 1, 2, 3, 4, 14, 29). As discussed above, there was substantial evidence to support the finding that Simmerly either knew or should have known his actions were improper. Thus, Simmerly's argument is not compelling.

¶66 Second, Simmerly challenges several of the hearing officer's findings on credibility. He fails, however, to make a specific enough argument as this court defers, "especially in matters of witness credibility," to the hearing officer. *In re Disciplinary Proceeding Against Ferguson*, 170 Wn.2d 916, 927, 246 P.3d 1236 (2011). Simmerly's unsupported contention that he was in fact credible is insufficient.

### 7. Remaining Challenges to Factual Findings

¶67 Finally, Simmerly's laundry list of challenges to many of the hearing officer's findings of fact with-

out any specific citation to the record is not considered. Such unspecific challenges are insufficient to overturn a hearing officer's findings of fact. *Marshall*, 160 Wn.2d at 331. A challenge must contain more than an alternative explanation or a previously rejected version of events. *Id.* Accordingly, these arguments are not considered.

B. Whether Disbarment Is the Appropriate Sanction for Simmerly

 ¶68 The hearing officer recommended suspension but the Board unanimously recommended disbarment. This disagreement exists because the two entities interpreted the injury element of the ABA *Standards* differently.[3] The Board characterized the injury caused by count 36 as serious, while the hearing officer did not. On all factual matters related to count 36 the two entities agreed. As a general rule, "[w]e give more weight to the Disciplinary Board's recommendation based on its unique experience and perspective in the administration of sanctions." *Van Camp*, 171 Wn.2d at 809. Additionally, the court reviews sanctions de novo but will uphold a unanimous recommendation by the Board " 'in the absence of a clear reason for departure.' " *In re Disciplinary Proceeding Against Behrman*, 165 Wn.2d 414, 422, 197 P.3d 1177 (2008) (quoting *In re Disciplinary Proceeding Against Whitt*, 149 Wn.2d 707, 717, 72 P.3d 173 (2003)). Simmerly claims that two reasons, related to the finding of injury, justify departing from the Board's recommendation. He also raises a proportionality argument.

---

[3] ABA STANDARDS std. 7.1:

> Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.

ABA STANDARDS std. 7.2:

> Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.

¶69 Simmerly first challenges whether there is enough factual evidence to support a finding of any injury. The hearing officer found that Simmerly's misrepresentation and fabricated ledgers "caused actual injury to the disciplinary system," which caused the auditor to "spen[d] a substantial amount of time correcting her reconstruct[ion] . . . so that she no longer relied upon" Simmerly's representations. DP at 29 (FFCL ¶ 192). Then, citing *Whitt*, the hearing officer stated that making misrepresentations during a disciplinary investigation is injurious to the public and the legal system as a whole.

¶70 The hearing officer's finding of injury is supported by substantial evidence. The administration of justice, which includes the disciplinary process, is harmed every time a trust account is misused. Trust accounts are essential to the way lawyers conduct their clients' business, and to the extent the public loses trust and confidence in trust accounts, the administration of justice is harmed. The more doubts people have about trust accounts, the more questions will be raised about them, thereby burdening the disciplinary system. Consequently, substantial evidence supported the hearing officer's finding of injury.

¶71 Simmerly next argues that the Board misapplied *Whitt* in reaching its decision recommending disbarment. He essentially argues that "the Board relies upon the *Whitt* legal conclusion language to make a fact finding as to injuries." Opening Br. at 29. In *Whitt*, we stated unequivocally that "[f]alsifying information during an attorney discipline proceeding" itself harms the public and the legal system. 149 Wn.2d at 720. Specifically, an attorney "harm[s] the public by jeopardizing the reputation and perception of the legal system as a whole, and harm[s] the legal system by attempting to circumvent the disciplinary process to evade responsibility for her misconduct." *Id.* The Board certainly relied on this conclusion in reaching its recommendation, but it was not error to do so. The Board appropriately looked at how we have previously categorized

misrepresentations during a disciplinary investigation and applied that precedent to Simmerly.

¶72 There is no meaningful distinction between the misrepresentations in *Whitt* and the misrepresentations here. Both attorneys "intentionally falsified information during [a] disciplinary investigation for . . . personal benefit." *Id.* at 719; DP at 29 (FFCL ¶¶ 192-93) ("he acted with both a dishonest and a selfish motive"). Granted, Whitt also caused serious or potentially serious injury to her client, but this fact was not necessary to find that her deception also caused serious injury to the public and the legal system. *See Whitt*, 149 Wn.2d at 720-21. As such, the Board acted appropriately in relying on *Whitt* and recharacterizing the injury as serious.

¶73 Simmerly next claims that whether the injury is serious or not serious is a factual finding entitled to deference. In support, he cites several cases stating that the extent of the harm is a factual question. Simmerly is correct that the *extent* of the harm is a factual question. In many circumstances, whether an injury is serious or not serious does depend on the extent of the harm. For example, deference to the hearing officer would be appropriate if there were questions about how many clients were affected and in what manner they were affected or if the hearing officer made his injury determination based on witness testimony. Such a situation, however, does not exist here. Here, the parameters of the injury are agreed on by both the hearing officer and the Board. Further, the characterization of the injury does not depend on any factual question such as witness testimony. The only question here is whether intentionally misrepresenting information and fabricating documents during a disciplinary investigation causes serious injury to the legal system and the public. Accordingly, the hearing officer's finding on this matter is not entitled to great deference.

¶74 Finally, we must consider whether the sanction is proportional. Simmerly claims that "other case law . . .

points to the fact that making misrepresentations in official proceedings does not necessarily result in disbarment." Opening Br. at 30 (citing *In re Disciplinary Proceeding Against Hicks*, 166 Wn.2d 774, 214 P.3d 897 (2009) (both hearing officer and the Board recommended two-year suspension for trust account violations and false statements to client and WSBA); *In re Disciplinary Proceeding Against Dornay*, 160 Wn.2d 671, 161 P.3d 333 (2007); *In re Disciplinary Proceeding Against Christopher*, 153 Wn.2d 669, 105 P.3d 976 (2005)).

¶75 These cases are all distinguishable. First, in *Hicks*, unlike in this case, neither the hearing officer nor the Board found that the misrepresentation caused serious or potentially serious injury. 166 Wn.2d at 787. Further, Hicks only misrepresented information; he did not also fabricate documents. *Id.* at 793. Because there were unchallenged findings by both the hearing officer and a unanimous Board, the court deferred to those entities' findings. Such deference does not exist where, as here, the Board has unanimously recommended disbarment. As for *Dornay* and *Christopher*, unlike in this case, both attorneys avoided disbarment because of significant mitigating factors. *Dornay*, 160 Wn.2d at 687-88 (personal or emotional problems); *Christopher*, 153 Wn.2d at 683-87 (remorse and personal/emotional problems). The only mitigating factor here was the absence of prior discipline. Weighing against Simmerly were five aggravating factors: (1) "dishonest or selfish motive," (2) "a pattern of misconduct," (3) "multiple offenses," (4) "refusal to acknowledge wrongful nature of conduct," and (5) "substantial experience in the practice of law." DP at 37 (FFCL ¶ 233). Had there been significant mitigating factors in Simmerly's case, then disbarment may not have been appropriate, but that is not the case. Therefore, we defer to the unanimous Board's recommendation of disbarment.

## V. CONCLUSION

¶76 We affirm the Board's recommendation to disbar Simmerly from the practice of law as well as the Board's other recommendations and the hearing officer's recommended restitution to Rushton. The hearing officer properly rejected Simmerly's version of events in finding that Simmerly intentionally misrepresented and fabricated information during the disciplinary process. Similarly, the hearing officer's other findings of fact were supported by substantial evidence in the record. Furthermore, the Board's decision to characterize the injury caused by Simmerly's actions as serious is supported by this court's decision in *Whitt*. Simmerly is unable to identify any sound reason to depart from the Board's unanimous recommendation of disbarment, and for that reason, we affirm his disbarment.

MADSEN, C.J., and C. JOHNSON, CHAMBERS, FAIRHURST, J.M. JOHNSON, STEPHENS, WIGGINS, and GONZÁLEZ, JJ., concur.