FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
APRIL 3, 2025

*Stgrec, C. J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
APRIL 3, 2025

*Sarah Pendleton*
SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Disciplinary Proceeding Against | ) ) ) | No. 202,188-3 |
| PAUL ARNOLD WALLSTROM, | ) ) | En Banc |
| Attorney at Law, WSBA No. 8605. | ) ) | Filed: <u>April 3, 2025</u> |
| _____ | ) | |

YU, J. — Attorneys are often required to safeguard others' property in the course of their work. To prevent mistakes and deter abuse, attorneys must deposit funds belonging to clients or third parties in a separate, interest-bearing "trust account." The funds in an attorney's trust account do not belong to the attorney. For that reason, it is both unethical and potentially criminal for an attorney to use their trust account as a "piggy bank" to cover business or personal expenses.

It is undisputed that attorney Paul Arnold Wallstrom has repeatedly violated these fundamental principles. Most egregiously, Wallstrom admits that he intentionally converted (i.e., stole) thousands of dollars from his trust account for his own use, despite knowing those funds belonged to his clients. For his theft of client funds and other serious misconduct, the Disciplinary Board (Board) of the

Washington State Bar Association (WSBA) unanimously recommended that Wallstrom be disbarred and ordered to pay restitution.

Wallstrom correctly recognizes that disbarment is the appropriate sanction in accordance with our precedent. Nevertheless, he asks the court to reject the Board's unanimous recommendation and impose only a one-year suspension. To reach this result, Wallstrom urges the court to disregard our well-established framework for reviewing attorney disciplinary sanctions and, instead, determine the appropriate sanction based on a single question: "'Do you really feel that Paul Wallstrom needs to be disbarred to achieve the purposes of attorney discipline?'" Appellant's Opening Br. at 24. We decline to follow this approach.

For decades, this court has been carefully refining its sanctions analysis to promote "consistency" and "fundamental fairness" through the evenhanded application of clearly established guidelines. *In re Disciplinary Proceeding Against Kuvara*, 149 Wn.2d 237, 258, 66 P.3d 1057 (2003). Wallstrom seeks to erase this body of law and return to a time when there was "no objective standard by which to measure the appropriateness of disciplinary sanctions in a particular case." *In re Disciplinary Proceeding Against Noble*, 100 Wn.2d 88, 94, 667 P.2d 608 (1983). Yet, he does not show that our precedent should be disavowed, and his subjective approach would certainly result in "[i]nconsistent sanctions," which "cast doubt on the efficiency and the basic fairness of all disciplinary systems."

ABA, Annotated Standards for Imposing Lawyer Sanctions Preface at xii (2d ed. 2019) (ABA Annotated Standards).

Thus, we reject Wallstrom's approach and follow the analytical framework set forth in our precedent. On the merits, we adopt the Board's unanimous recommendation of disbarment and restitution to Wallstrom's former client.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The background is derived primarily from the hearing officer's amended findings of fact, conclusions of law, and recommended sanction. Except where noted otherwise, the hearing officer's factual findings are unchallenged and, therefore, "verities on appeal." *In re Disciplinary Proceeding Against Kelley*, 3 Wn.3d 541, 550, 553 P.3d 1101 (2024).

A.      Wallstrom's law practice and financial recordkeeping

Wallstrom was admitted to practice in Washington in 1978. Since 2009, he has operated a solo practice focusing on personal injury work. At all relevant times, Wallstrom maintained two bank accounts associated with his solo practice: a business operating account and a separate trust account for funds belonging to clients and third parties. *See* RPC 1.15A(c).

Wallstrom maintains his financial records using QuickBooks software. He is the only person with signature authority on his trust account. However, Wallstrom has not taken any trust account management classes, and he testified at

his disciplinary hearing that he was "still not clear" on his ethical duties to reconcile his trust account and maintain accurate financial records. 3 Verbatim Rep. of Proc. (VRP) (Aug. 18, 2022) at 434; *see* RPC 1.15A(h)(6), 1.15B(a)(8).[1]

Wallstrom initially came to the attention of the Office of Disciplinary Counsel (ODC) in February 2017, when he overdrew his trust account by presenting a check against insufficient funds. ODC opened a grievance shortly thereafter to investigate the overdraft. While the investigation was ongoing, Wallstrom presented two more trust account checks against insufficient funds, causing additional overdrafts in September 2017 and April 2018. Wallstrom could not fully explain the overdrafts, and ODC ultimately decided to audit five years of his trust account records, from January 2014 to January 2019.

Wallstrom's financial records for the audit period were incomplete and inaccurate. He had recorded "deposits . . . that never occurred," listed the "wrong dates and wrong payees" for various transactions, and incorrectly designated transfers and withdrawals as "fees" where he "was not owed any fees." Clerk's Papers (CP) at 70. In addition, around the time ODC opened its grievance, Wallstrom stopped regularly reconciling his trust account, altered his check register to make it appear balanced, and submitted the altered check register to

---

[1] "Reconciliation" is an accounting practice of "compar[ing] one set of records to another set of records for accuracy." 1 VRP (Aug. 16, 2022) at 33.

ODC. The hearing officer found these alterations were not intentional but were instead caused by Wallstrom's "negligent and careless" recordkeeping. *Id.* at 84. Wallstrom's poor recordkeeping also significantly extended the time it took to investigate ODC's grievance, as discussed below.

B.      Wallstrom's misconduct as to specific clients and third parties

ODC's audit revealed multiple instances of serious financial misconduct. Many of the violations followed a similar pattern in which Wallstrom removed client and third-party funds from his trust account for his own use without entitlement to do so, then falsely recorded the transactions as earned fees in his client ledger records.[2] Wallstrom later restored some of the funds, but not always on a timely or voluntary basis. At the disciplinary hearing, Wallstrom asserted he had merely "harvested money" from his trust account "in a mistaken belief it was his," but ODC argued Wallstrom had treated his trust account "as a piggy bank." 4 VRP (Aug. 19, 2022) at 646-47, 605.

1.      Client GL and third party King County

Some of Wallstrom's most serious misconduct relates to his representation of GL. GL was injured in a car accident while working for King County Metro

---

[2] A lawyer's trust account records must include "individual client ledger records containing either a separate page for each client or an equivalent electronic record showing all individual receipts, disbursements, or transfers," including specific details about each transaction. RPC 1.15B(a)(2).

(King County), a self-insured employer. Wallstrom represented GL in a personal injury action for a one-third contingency fee. King County paid workers' compensation benefits to GL and notified Wallstrom of its subrogation reimbursement claim on any recovery in the personal injury action.

In February 2014, the personal injury action settled for $50,000. Wallstrom drafted a settlement statement giving himself $17,789.40 in attorney fees and costs, and dividing the remainder evenly between GL and King County ($16,105.30 each). He deposited the settlement proceeds in his trust account, withdrew his attorney fees and costs, and paid GL about $9,000. Wallstrom subsequently removed an additional $8,500 from his trust account in a series of transactions recorded on GL's client ledger. He knew he had no right to these funds, yet he knowingly and intentionally converted them for his own use, such as paying personal bills and banking fees. Wallstrom restored $3,000 of the converted funds by the end of July 2014, but he retained the balance ($5,500) for an extended period.

King County disagreed with Wallstrom's settlement statement regarding the value of its subrogation claim. Following negotiations, they agreed in November 2014 to divide the settlement into thirds, with Wallstrom and GL each receiving $16,666.67 and King County receiving $16,666.66. As compared to the November

2014 agreement, Wallstrom's prior disbursements had resulted in an overpayment to himself, an underpayment to GL, and no payment to King County.[3]

In December 2014, Wallstrom sent GL approximately $7,100. This amount was consistent with the initial settlement statement, but about $500 less than GL was owed pursuant to the November 2014 agreement. Similarly, Wallstrom wrote a check to King County for $16,105.30, about $500 less than the November 2014 agreement provided. Wallstrom had not yet restored the $5,500 he converted from GL's settlement funds, discussed above, so he used other clients' funds to pay for the disbursement to King County. However, King County did not receive its disbursement because, in January 2015, Wallstrom accidentally mailed the check to the Department of Labor and Industries (L&I).

After initially depositing Wallstrom's check, L&I noticed the mistake and sent him a refund check for the same amount ($16,105.30) in February 2015, with GL's last name and claim number included in the text block for Wallstrom's address. One week later, L&I issued its final order for the distribution of GL's settlement, with the same claim number printed at the top of the page. Consistent with the November 2014 agreement discussed above, the February 2015 distribution order divided GL's settlement into thirds.

---

[3] As of November 2014, Wallstrom had taken over $23,000 for himself (nearly $17,800 in fees and costs, plus $5,500 in converted funds) and paid less than $9,000 to GL.

Wallstrom deposited the refund check from L&I in his trust account and recorded it in GL's client ledger. However, instead of paying King County in accordance with the February 2015 distribution order, Wallstrom converted the funds for his own use. As discussed further below, his mental state in doing so is the only disputed factual issue on appeal. The hearing officer found that Wallstrom "knew . . . he was converting funds belonging to a third party" and that he "knowingly and intentionally used the $16,105.30 for [his] own purposes." CP at 77. However, Wallstrom argues he was merely negligent, asserting that he "had no way of knowing" the check from L&I was related to GL's case. Appellant's Opening Br. at 15. The hearing officer found that Wallstrom's testimony on this point was not credible and was contradicted by the other evidence presented.

In March 2015, shortly after Wallstrom had withdrawn the entire amount of L&I's refund check for his own use, King County sent a demand letter for its subrogation funds. Wallstrom responded that he had already paid $16,105.30, omitting the fact that L&I had recently sent him a refund check for that amount. With his response, Wallstrom enclosed a check to King County for $531.36, asserting that amount would fully satisfy the February 2015 distribution order. In fact, Wallstrom's check was still $30 short, but King County did not pursue the matter further at that time, relying on Wallstrom's misleading assertion that he had already paid most of the funds.

By January 2019, the end of ODC's audit period, Wallstrom still had not paid the balances due to GL ($531.66) or King County ($16,135.30) from GL's February 2014 settlement. Eventually, ODC contacted King County as part of its investigation, prompting King County to send Wallstrom another demand letter. Wallstrom paid the balance due to King County on May 29, 2020, but at the time of his August 2022 disciplinary hearing, Wallstrom still had not fully paid GL. He does not challenge the recommended sanction of $531.66 in restitution to GL, with interest accruing as of December 2014.

2. Clients SF and SE

In 2014 and 2015, Wallstrom committed similar ethical violations in connection with two unrelated clients, SF and SE. First, in early June 2014, Wallstrom obtained a settlement for SF in a personal injury action and distributed the proceeds pursuant to the settlement statement. At that point, Wallstrom was not holding any more funds in trust for SF. Nevertheless, he removed an additional $4,000 from his trust account and recorded the transactions on SF's client ledger as "fees." Because SF had no money left in Wallstrom's trust account, he used other clients' funds to pay for the transactions.

About a year later, in April 2015, Wallstrom was representing SE in an hourly fee matter. He was not holding any funds in trust for SE, but he transferred $1,500 out of his trust account and recorded it on SE's client ledger. As he had

done with SF, Wallstrom used other clients' funds to pay for the transfer. In both cases, it is undisputed that Wallstrom knowingly and intentionally used the funds for his own purposes.

3.      Client MM

Wallstrom's misconduct relating to MM occurred after his first trust account overdraft in 2017, while ODC was conducting its grievance investigation. Wallstrom represented MM in two personal injury actions, each for a one-third contingency fee.

MM's first action settled in June 2017 for $50,000. Wallstrom's settlement statement allocated roughly $26,000 to MM, $20,000 to attorney fees and costs, and $4,000 to MM's insurer for a subrogation claim. Wallstrom timely paid MM and withdrew his full attorney fees and costs, but he did not pay the insurer. Instead, Wallstrom transferred the insurer's funds to his business operating account and recorded the transfer on MM's client ledger as "fees." It is undisputed that Wallstrom knew he was not entitled to those funds and that he knowingly and intentionally used the funds for his own purposes, such as insurance and mortgage payments.

Wallstrom did not pay the insurer's subrogation claim until August 2017, when MM's second personal injury action settled for $100,000. At that time,

Wallstrom took a reduced fee from MM's second settlement to restore the funds he had converted from MM's first settlement.

By the end of September 2017, Wallstrom had overdrawn his trust account a second time, and he was no longer holding any funds in trust for MM. However, on September 29, 2017, Wallstrom withdrew about $1,000 from his trust account and recorded it on MM's client ledger. Because MM had no money in the trust account, Wallstrom paid for the transfer using other clients' funds, as he had previously done with SF and SE.

C.      Wallstrom's personal circumstances at the time of the misconduct

Wallstrom argues on appeal that his sanction should be mitigated, in part, because he was experiencing personal and emotional problems during some of the misconduct described above, including alcohol abuse and illness in his family. *See* ABA ANNOTATED STANDARDS std. 9.32(c) at 487. We must therefore consider his relevant personal circumstances at the time of his misconduct.

Wallstrom had an alcohol dependency as a young lawyer, but he stopped drinking alcohol early in his career and remained sober for about 20 years. He started abusing alcohol again in 2009 or 2010, when his family was experiencing serious health issues. Wallstrom was transitioning into his solo practice around the same time, but he was "living somewhat in a fog" and could not "answer questions or explain particular trust transactions during this time due to [his] excessive

drinking." CP at 81. Wallstrom quit drinking again in July 2014, and he has remained sober ever since. He became very active in his church, which supported his recovery but took time away from his law practice.

The hearing officer found that much of Wallstrom's misconduct occurred while he was abusing alcohol, including his misconduct in SF's case and some of his misconduct in GL's case, as detailed above. However, it is undisputed that Wallstrom's personal "problems did not cause the misconduct, particularly the misappropriation of trust funds or [his] persistent failure to keep accurate financial records." *Id.* At all times, Wallstrom knew he must "replace" the funds he converted, and he "knew right from wrong as far as preserving the integrity of trust funds." *Id.* at 81-82. Therefore, the hearing officer concluded that Wallstrom's "personal and emotional problems do not constitute an extraordinary mitigating factor with respect to the presumptive disbarment sanction and should otherwise be given little weight." *Id.* at 86. Wallstrom challenges this conclusion on appeal.

D.     Procedural history of the disciplinary proceeding

Wallstrom also seeks a mitigated sanction based on delay in the proceedings and the passage of time. *See* ABA ANNOTATED STANDARDS std. 9.32(j) at 487; ELC 1.4. Thus, it is necessary to review the procedural history in some detail.

As discussed, ODC opened its grievance in March 2017, shortly after Wallstrom's first trust account overdraft. However, because Wallstrom's financial

records were incomplete and inaccurate, ODC had to "reconstruct" his records before conducting its audit. CP at 88. To do so, auditors obtained records from Wallstrom and through bank subpoenas, set up a new QuickBooks file, and entered each transaction from the five-year audit period in chronological order, working "directly from the copies of the checks and the deposited items." 1 VRP (Aug. 16, 2022) at 66. An auditor then reconciled the check registers, bank statements, and individual client ledgers for each month from January 2014 to January 2019. The auditor testified this process took "a long time" and "a lot of investigation." 2 VRP (Aug. 17, 2022) at 342.

The auditor's report was completed in August 2020, about three years after ODC opened its grievance. Less than six months later, in January 2021, ODC filed a formal complaint charging Wallstrom with eight counts of misconduct. Wallstrom did not timely file an answer, doing so only after ODC moved for default. The disciplinary hearing was scheduled for January 11, 2022, about one year after the formal complaint was filed, and was subsequently continued twice on Wallstrom's motion. It is undisputed that Wallstrom sought these continuances in good faith due to illness in his family.

The disciplinary hearing was ultimately held in August 2022. At the end of the hearing, Wallstrom's counsel suggested the hearing officer should draft preliminary written findings and conclusions, and then "circulate them for

comment" from counsel before entering a final decision. 4 VRP (Aug. 19, 2022) at 675. However, when the hearing officer did so, Wallstrom's counsel declined to comment, stating he would prefer to follow "the ELC 10.16(c) process" to modify, amend, or correct the hearing officer's decision after its entry. CP at 240.

In November 2022, the hearing officer issued findings of fact, conclusions of law, and recommended sanctions. Two of the eight counts against Wallstrom were dismissed, but the hearing officer found that ODC proved the remaining six counts by a clear preponderance of the evidence:

Count 1: Using and converting client and third person funds in violation of RPC 1.15A(b) and RPC 8.4(b) and (c).

Count 2: Failing to maintain client and third person funds in a trust account in violation of RPC 1.15A(c).

Count 3: Disbursing more funds than clients had on deposit and using one client's funds on behalf of another in violation of RPC 1.15A(h)(8).

Count 4: Failing to promptly pay and/or deliver funds that clients and third persons were entitled to receive in violation of RPC 1.15A(f).

Count 5: Failing to maintain check registers and individual client ledger records in violation of RPC 1.15A(h)(2) and RPC 1.15B(a)(1) and (a)(2).

Count 6: Failing to reconcile his trust account check register in violation of RPC 1.15A(h)(6) and RPC 1.15B(a)(8).

*See id.* at 18-19. Wallstrom admits to most of these violations, although he partially disputes counts 1 and 3, as discussed below.

For purposes of sanctions, the hearing officer determined that Wallstrom's most serious misconduct was his knowing conversion and theft of client funds, which presumptively warrants disbarment. ABA ANNOTATED STANDARDS std. 4.11, at 145, std. 5.11(a) at 238. The hearing officer also found four aggravators (dishonest or selfish motive, pattern of misconduct, multiple offenses, and substantial experience in the practice of law), but no significant or extraordinary mitigation. ABA ANNOTATED STANDARDS std. 9.22(b)-(d), (i) at 451. Based on these findings, the hearing officer recommended disbarment and restitution to GL. The hearing officer did not conduct a full sanctions analysis for Wallstrom's remaining violations, noting that the "'ultimate sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct.'" *In re Disciplinary Proceeding Against Petersen*, 120 Wn.2d 833, 854, 846 P.2d 1330 (1993) (quoting ABA, STANDARDS FOR IMPOSING LAWYER SANCTIONS at 6 (1986)).

Contrary to his earlier statement, Wallstrom's counsel did not follow the ELC 10.16(c) process to modify, amend, or correct the hearing officer's decision. Instead, he appealed directly to the Board for the sole purpose of remanding to the hearing officer for a determination of the presumptive sanction for each ethical violation Wallstrom committed. On remand, the hearing officer issued amended findings, conclusions, and recommended sanctions in October 2023. Consistent with his original decision from the previous year, the hearing officer's amended

decision found that ODC proved the same six counts of misconduct by a clear preponderance of the evidence and recommended disbarment and restitution to GL. *See* CP at 82-84, 88.

The Board unanimously adopted the hearing officer's amended decision and recommendations. Wallstrom timely appealed to this court and was granted three extensions of time to file his briefs. Oral argument was set for January 2025, and then rescheduled by the court for February 2025. Three days before the hearing date, Wallstrom moved to continue oral argument for 60 days, which was denied.[4]

ISSUES

A.  Should the court reconsider its current analytical framework for reviewing attorney disciplinary sanctions?

B.  Should the court adopt the Board's unanimous disbarment recommendation?

ANALYSIS

For many years, this court has "use[d] a well established three-stage analysis to review the Board's recommended sanction" in attorney disciplinary proceedings. *In re Disciplinary Proceeding Against Preszler*, 169 Wn.2d 1, 18, 232 P.3d 1118 (2010). To ensure sanctions are consistent with our precedent and

---

[4] Wallstrom's counsel did not appear for oral argument. When contacted by the clerk of the court, counsel stated that he had mistaken the time. This court heard oral argument from disciplinary counsel, and we have fully considered the record and the parties' briefing.

the ABA *Standards*, we must (1) "'evaluate whether the Board properly determined the presumptive sanction,'" (2) "determine whether any aggravating or mitigating circumstances call for a departure from the presumptive sanction," and (3) consider "'proportionality of the sanction'" and "'the extent of agreement among the members of the Disciplinary Board.'" *Id.* (quoting *In re Disciplinary Proceeding Against Marshall*, 160 Wn.2d 317, 342, 157 P.3d 859 (2007); *In re Disciplinary Proceeding Against Schwimmer*, 153 Wn.2d 752, 764, 108 P.3d 761 (2005)). Within this framework, "[d]isbarment is the presumptive sanction when a lawyer steals client funds," and "only 'extraordinary' mitigation" will justify a lesser sanction. *In re Disciplinary Proceeding Against Fossedal*, 189 Wn.2d 222, 234, 399 P.3d 1169 (2017) (internal quotation marks omitted) (quoting *Schwimmer*, 153 Wn.2d at 760).

"Sanctions are reviewed de novo." *Kelley*, 3 Wn.3d at 551. However, the Board has "unique experience and perspective in the administration of sanctions," so we do "not lightly depart" from the Board's recommendations "[u]nless we are able to articulate specific reasons for adopting a different sanction." *Id.* at 550-51. On review, "unchallenged findings of fact made by the hearing officer and affirmed by the Board will be accepted as verities," and "[c]hallenged findings of fact will be accepted as long as they are supported by substantial evidence." *Id.* at 550. We review conclusions of law de novo. *Id.* at 551.

In this case, the Board unanimously adopted the hearing officer's recommendation to disbar Wallstrom for his theft of client funds and other serious financial misconduct. On appeal, Wallstrom correctly "concedes" that "disbarment is the likely result" in accordance with this court's precedent. Appellant's Reply Br. at 2. Nevertheless, he asks the court to impose only a one-year suspension,[5] asserting two general lines of argument.

Wallstrom primarily argues that the court should disregard its three-stage analysis and, instead, determine the appropriate sanction based on each justice's personal feelings and policy preferences. We rejected this subjective approach long ago because it results in inconsistent and unpredictable sanctions, undermining the fairness and efficacy of attorney discipline. Therefore, we review the Board's recommendation in accordance with our well-established, three-stage analysis.

In his secondary line of argument, Wallstrom challenges certain findings of fact and conclusions of law made by the hearing officer and affirmed by the Board. We reject these challenges on the merits and adopt the Board's unanimous disbarment recommendation.

---

[5] "A suspension must be for a fixed period of time not exceeding three years." ELC 13.3(a). Wallstrom does not explain why his suspension should be limited to one year.

A.      We reaffirm the sanctions analysis set forth in our precedent

As discussed below, the Board's recommendation in this case is fully supported by the record and our precedent.  To avoid this result, Wallstrom urges the court to disregard the "prior policy makers' positions" expressed in our case law and adopt his view of "an individualized justice model."  Appellant's Reply Br. at 5; Appellant's Opening Br. at 24.  Years ago, this court wisely rejected the approach Wallstrom suggests, and we do so again today.

This court adopted its first procedural rules for the attorney discipline system in 1973.  WASH. STATE BAR ASS'N, REPORT OF THE DISCIPLINE 2000 TASK FORCE 4 (July 2001), https://washlawlib.bywatersolutions.com/cgi-bin/koha/opac-retrieve-file.pl?id=fff9eb8ae27d35982f81ffe998c2e941 (DISCIPLINE 2000 REPORT).  Yet, 10 years later, we observed that there was still "[n]o clear formula" for sanctions, leading to "considerable room for disagreement" between members of the Board and members of this court.  *Noble*, 100 Wn.2d at 93-94.  This concern was not unique to Washington; at the time, many jurisdictions were struggling with "[i]nconsistent sanctions" due to a lack of "clearly developed standards."  ABA ANNOTATED STANDARDS Preface at xii.

Against this backdrop, this court began to refine its approach to attorney disciplinary sanctions.  In an initial "attempt to provide an objective standard," we "adopted five factors to consider when determining the appropriate sanction for

19

lawyer misconduct," sometimes called the "*Noble* factors."[6]  *Kuvara*, 149 Wn.2d

at 256 (citing *Noble*, 100 Wn.2d at 95-96).  These factors provided some guidance

but, when *Noble* was decided in 1983, "the [1986 ABA] *Standards* had not yet

been enacted."  *Id.*

The ABA *Standards* "were designed to increase uniformity in imposing

sanctions" with a two-stage analytical "framework": (1) determine the presumptive

sanction and (2) consider aggravating and mitigating circumstances.  *Id.* at 256-57,

252 (citing ABA, STANDARDS FOR IMPOSING LAWYER SANCTIONS std. 3.0 (1991 &

Supp. 1992)).  We "commend[ed]" this approach early on, and this court "formally

adopted" the ABA *Standards* in 1990.  *In re Disciplinary Proceeding Against*

*Rentel*, 107 Wn.2d 276, 283, 729 P.2d 615 (1986); *Kuvara*, 149 Wn.2d at 257

(citing *In re Disciplinary Proceeding Against Johnson*, 114 Wn.2d 737, 745, 790

P.2d 1227 (1990)).

Following our adoption of the ABA *Standards*, we continued to refine our

analysis, recognizing that "'[i]nconsistent sanctions, either within a jurisdiction or

among jurisdictions, cast doubt on the efficiency and the basic fairness of all

disciplinary systems.'"  *Kuvara*, 149 Wn.2d at 257 (quoting ABA, STANDARDS FOR

---

[6] The *Noble* factors were "(1) the purposes of attorney discipline, (2) proportionality of the sanction to the misconduct, (3) the effect of the sanction on the attorney, (4) whether the Board's recommendation is supported by the record, and (5) the extent of agreement among the members of the Board." *Kuvara*, 149 Wn.2d at 256.

IMPOSING LAWYER SANCTIONS at 1 (1991 & Supp. 1992)). For instance, when it became apparent that our existing procedural rules did "not mesh well" with the new ABA *Standards*, this court and the WSBA established the Discipline 2000 Task Force to examine the issue, leading to the adoption of our current Rules for the Enforcement of Lawyer Conduct (ELC). DISCIPLINE 2000 REPORT 4, 1.

Like the ELCs, our three-stage sanctions analysis arose from the refinement of existing law in light of the ABA *Standards*. As discussed, the *Noble* factors were issued several years before the *Standards*. After we adopted the *Standards*, this court revisited *Noble* and held that "three of the five" factors had become "superfluous."[7] *Kuvara*, 149 Wn.2d at 257. Yet, we retained the *Noble* factors of "proportionality and unanimity," reasoning these were still necessary "to achieve not only consistency but fundamental fairness." *Kelley*, 3 Wn.3d at 550 n.9; *Kuvara*, 149 Wn.2d at 258. The court added these remaining *Noble* factors to the two-stage analysis set forth in the ABA *Standards*, thereby creating our "well established three-stage analysis" still in use today. *Preszler*, 169 Wn.2d at 18; *see generally Kelley*, 3 Wn.3d 541; *In re Disciplinary Proceeding Against Huynh*, 3 Wn.3d 648, 685-87, 555 P.3d 398 (2024).

---

[7] The "superfluous" *Noble* factors are "the purpose of attorney discipline," "the effect of the sanction on the attorney," and "that in order for the Board's recommendation to be upheld, it must be supported by the record." *Kuvara*, 149 Wn.2d at 257-58.

Thus, since this court adopted the ABA *Standards* over 30 years ago, we have carefully refined our sanctions analysis to provide clear guidelines and promote consistent decision-making, while preserving case-by-case considerations of aggravating and mitigating circumstances, proportionality, and unanimity. Nevertheless, Wallstrom argues that our three-stage sanctions analysis places too much emphasis on consistency, contrary to the "individualized" approach he proposes. Appellant's Opening Br. at 24.

In Wallstrom's approach, each member of this court would assume the dual roles of "the sentencing judge" and "a legislator" in every attorney discipline case. *Id.*; Appellant's Reply Br. at 5. To fulfill these dual roles, Wallstrom would have each justice view every sanction as a direct expression of the justice's personal policy preferences, "feelings[,] and beliefs." Appellant's Reply Br. at 6. Wallstrom's approach does not appear to give any weight to precedent or to "the Board's unique experience and perspective in the administration of sanctions." *Kelley*, 3 Wn.3d at 550. Instead, according to Wallstrom, each justice would determine the appropriate sanction based on their gut response to a single question: "'Do you really feel that Paul Wallstrom needs to be disbarred to achieve the purposes of attorney discipline?'" Appellant's Opening Br. at 24.

It is certainly true that "[t]his court has definitive authority over matters relating to attorney discipline," and we must be open to revisiting our precedent if

22

it is shown to be incorrect and harmful, or if its legal underpinnings have changed or disappeared. *Kelley*, 3 Wn.3d at 550; *see State v. Otton*, 185 Wn.2d 673, 678, 374 P.3d 1108 (2016). However, Wallstrom makes no such showing. He does not argue the legal underpinnings of our three-stage analysis have changed and, although he suggests our analysis is incorrect and harmful because it lacks flexibility, he fails to support this assertion. For instance, Wallstrom does not point to a pattern of unjust sanctions imposed by this court, nor does he compare our approach to that of other jurisdictions.

Ultimately, Wallstrom simply disagrees with the "likely result" of disbarment in his case. Appellant's Reply Br. at 2. To avoid this result, he asks the court to adopt an "organic" approach to attorney disciplinary sanctions, with "no objective standard by which to measure the appropriateness of disciplinary sanctions in a particular case." *Id.* at 5; *Noble*, 100 Wn.2d at 94. However, this court rejected Wallstrom's proposed subjective approach long ago because it resulted in "considerable room for disagreement" and "[i]nconsistent sanctions," which "cast doubt on the efficiency and the basic fairness of all disciplinary systems." *Noble*, 100 Wn.2d at 94; ABA ANNOTATED STANDARDS Preface at xii. Wallstrom fails to account for this history. Therefore, we reject his proposed approach and review the Board's recommended sanction in accordance with the well-established, three-stage analysis set forth in our precedent.

23

B.      We adopt the Board's unanimous disbarment recommendation

Within our three-stage analytical framework, Wallstrom challenges several findings and conclusions, primarily regarding mitigating circumstances.  We reject these challenges and adopt the Board's unanimous disbarment recommendation.

1.      It is undisputed that the presumptive sanction is disbarment

The first stage of our analysis is to "evaluate whether the Board properly determined the presumptive sanction" based on "(1) the ethical duties violated, (2) the lawyer's mental state, and (3) the actual or potential injury caused by the lawyer's conduct." *Marshall*, 160 Wn.2d at 342; *Kelley*, 3 Wn.3d at 551.  "When multiple ethical violations are found, the 'ultimate sanction imposed should at least be consistent with the sanction for the most serious instance.'" *Kelley*, 3 Wn.3d at 552 (internal quotation marks omitted) (quoting *Petersen*, 120 Wn.2d at 854).

Here, it is undisputed that Wallstrom's most serious misconduct was his knowing and intentional theft of client funds.  Wallstrom does not challenge the finding that this "involved serious criminal conduct and caused serious injury to the rightful owners of the converted funds and potential injury to the legal system." CP at 82.  He also correctly concedes that the presumptive sanction is disbarment. *See* Appellant's Opening Br. at 38; ABA ANNOTATED STANDARDS std. 4.11, at 145, std. 5.11(a) at 238.  However, he challenges two of the findings and

conclusions underlying his presumptive sanction.  We reject Wallstrom's

challenges and accept his concession that the presumptive sanction is disbarment.

> a.      Substantial evidence supports the finding that Wallstrom knowingly and intentionally converted King County's funds

Wallstrom admits that he knowingly and intentionally converted funds from

his clients (GL and MM).  However, for the first time on appeal, Wallstrom

"disputes the finding that he mishandled the King Cou[n]ty funds."[8]  Appellant's

Opening Br. at 13.  We accept this finding because it is supported by substantial

evidence.  *Kelley*, 3 Wn.3d at 550.

The basic facts are not disputed.  Wallstrom admits that he "withdrew and

used" GL's settlement funds for himself instead of paying King County's

subrogation claim, and that he did not pay the subrogation claim until King County

sent a follow-up demand letter in 2020.  Appellant's Opening Br. at 13.  He

challenges only the "findings of knowing and intentional misconduct," arguing that

he was merely negligent in converting King County's funds and emphasizing that

the evidence of his mental state is "circumstantial."  *Id.* at 17, 14.

---

[8] ODC asks the court to deem this argument waived by analogy to RAP 2.5.  However, as ODC acknowledges, we have "previously declined to adopt such a rule" for attorney discipline cases.  Answering Br. of ODC at 43 (citing *In re Disciplinary Proceeding Against Kronenberg*, 155 Wn.2d 184, 191 n.2, 117 P.3d 1134 (2005)).  ODC also does not address the waiver standard we recently reaffirmed in *Huynh*, which provides that "a lawyer who fails to raise an issue before the Board waives that issue when there is 'strong evidence' of such a waiver."  3 Wn.3d at 684 (citing *In re Disciplinary Proceeding Against Vetter*, 104 Wn.2d 779, 781, 711 P.2d 284 (1985)).  Therefore, we reach the merits of this issue.

Ordinarily, "[t]he law does not distinguish between direct and circumstantial evidence in terms of their weight or value."  6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 1.03, at 31 (7th ed. 2019) (boldface omitted); *see also* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 5.01, at 188 (5th ed. 2021).  However, Wallstrom argues that in attorney discipline cases, a challenged factual finding based on circumstantial evidence must be rejected if the evidence "is not conclusive." Appellant's Opening Br. at 14.  To support this view, Wallstrom points to *Guarnero*, in which we stated that the WSBA "must produce facts from which only one reasonable conclusion may be inferred."  *In re Disciplinary Proceeding Against Guarnero*, 152 Wn.2d 51, 61, 93 P.3d 166 (2004).

We have already rejected this interpretation of *Guarnero*.  *See In re Disciplinary Proceeding Against Simmerly*, 174 Wn.2d 963, 982-83, 285 P.3d 838 (2012).  Contrary to Wallstrom's reading, *Guarnero* holds that circumstantial evidence need *not* conclusively "exclude or disprove the respondent lawyer's alternative theories."  152 Wn.2d at 61.  Instead, a challenged factual finding based on "substantial circumstantial evidence" will be upheld if "the hearing officer fairly rejected as unreasonable" the respondent attorney's theory.  *Id.*  Thus, as we recently reaffirmed, "'circumstantial evidence is as good as direct evidence'" in attorney discipline cases, and "a lawyer's knowledge and intent may be inferred

from the circumstances." *Huynh*, 3 Wn.3d at 659 (internal quotation marks omitted) (quoting *In re Disciplinary Proceeding Against McGrath*, 174 Wn.2d 813, 818, 280 P.3d 1091 (2012), and citing *In re Disciplinary Proceeding Against Placide*, 190 Wn.2d 402, 441, 414 P.3d 1124 (2018); RPC 1.0A(f)).

In this case, substantial circumstantial evidence clearly supports the hearing officer's finding that Wallstrom knowingly and intentionally converted King County's funds. Shortly after Wallstrom accidentally mailed King County's check to L&I, he received a refund check from L&I for that precise amount, with GL's last name and claim number printed in the text box for Wallstrom's address.[9] Wallstrom admits he deposited L&I's check in his trust account, recorded it in GL's client ledger, and spent the entire amount for his own purposes, despite having no records to indicate L&I owed him any money.

Wallstrom insists that he "had no way of knowing what the [L&I] check was for" and that "[i]t was entirely reasonable for him to think . . . the funds were related to some other matter, even if he could not figure out what that matter was." Appellant's Opening Br. at 15, 13. However, Wallstrom's negligence theory was "fairly rejected as unreasonable" by the hearing officer. *Guarnero*, 152 Wn.2d at

---

[9] Wallstrom purports to challenge the "assertion that the name and case number were clearly printed on the check," but the hearing officer's decision does not use the word "clearly." Appellant's Opening Br. at 15. The hearing officer found that "GL's name and case number were printed as part of [Wallstrom]'s address on the check," just as Wallstrom states in his briefing. CP at 77; *see* Appellant's Opening Br. at 15.

61. The record shows that Wallstrom had sufficient information to recognize that L&I's check was related to GL's case. Whether he overlooked this information negligently or intentionally is a question of fact. On that question, the hearing officer reasonably found Wallstrom's testimony "not credible" in light of substantial circumstantial evidence to the contrary. CP at 77. This court does "not judge the credibility of witnesses." *Huynh*, 3 Wn.3d at 659.

Thus, the circumstantial evidence of Wallstrom's mental state, though perhaps not conclusive, is "substantial," as required by our precedent. *Guarnero,* 152 Wn.2d at 61. We accept the hearing officer's finding, affirmed by the Board, that Wallstrom knowingly and intentionally converted King County's funds.

    b.  The hearing officer and the Board correctly applied RPC 1.15A(h)(8) as a matter of law

Wallstrom also disputes that he violated RPC 1.15A(h)(8) when he used other clients' funds to pay for disbursements he recorded in the client ledgers for SF, SE, and MM. As a matter of law, we affirm the application of RPC 1.15A(h)(8) to Wallstrom's admitted misconduct.

RPC 1.15A(h)(8) provides, in full, "Disbursements on behalf of a client or third person may not exceed the funds of that person on deposit. The funds of a client or third person must not be used on behalf of anyone else." Wallstrom admits he violated this rule in GL's case. He also admits to making disbursements that he "allocated to [SF, SE, and MM] on ledger cards" but paid for "us[ing] funds

of other clients." Appellant's Opening Br. at 19. Nevertheless, Wallstrom argues these disbursements were not "'on behalf of'" SF, SE, or MM because, unlike GL, those clients "did not owe money." *Id.* In other words, Wallstrom argues that RPC 1.15A(h)(8)'s reference to disbursements "on behalf of a client" excludes disbursements the attorney *falsely recorded* on behalf of a client. He cites no case law adopting this view, and he offers no supporting analysis based on principles of statutory and court rule interpretation.

In accordance with the plain meaning RPC 1.15A(h)(8), we hold that when an attorney records a disbursement in a particular client's ledger, the attorney has made a disbursement "on behalf of" that client. If the ledger entry was false, that is an additional ethical violation, not a defense. *See* RPC 1.15A(h)(2), 1.15B(a)(2). Thus, the hearing officer and the Board correctly determined that Wallstrom violated RPC 1.15A(h)(8) as to SF, SE, and MM, in addition to GL.

Ultimately, despite Wallstrom's claims of error, the first stage in our three-stage sanctions analysis is undisputed. Wallstrom's most serious misconduct was his knowing and intentional theft of client funds, and he correctly concedes this carries a presumptive sanction of disbarment.

2.     Wallstrom does not establish extraordinary mitigation

In the second stage of our analysis, we "determine whether any aggravating or mitigating circumstances call for a departure from the presumptive sanction."

*Preszler*, 169 Wn.2d at 18. We have long held that where an attorney steals client funds, as Wallstrom did, the presumptive sanction of disbarment must be imposed "absent extraordinary mitigating circumstances." *Rentel*, 107 Wn.2d at 286; *see also Fossedal*, 189 Wn.2d at 234.

Wallstrom does not challenge the four aggravators found by the hearing officer: dishonest or selfish motive, pattern of misconduct, multiple offenses, and substantial experience in the practice of law. CP at 85-86 (citing ABA ANNOTATED STANDARDS std. 9.22(b)-(d), (i) at 451). Nevertheless, he argues there are extraordinary mitigating circumstances, including the passage of time, delay in the proceedings, and personal and emotional problems. *See* ELC 1.4; ABA ANNOTATED STANDARDS std. 9.32(j), (c) at 487. We affirm the Board's unanimous conclusion that the applicable mitigators are not extraordinary and do not warrant a departure from the presumptive sanction of disbarment in this case.

        a.     Neither delay in the proceedings nor the "passage of time" is an applicable mitigating circumstance

Wallstrom's primary argument for a mitigated sanction is simply "the passage of time." Appellant's Opening Br. at 25. According to Wallstrom, his most serious misconduct ceased in 2017, "[t]he exception being repaying to King County the subrogation funds on May 29, 2020." *Id.* at 34. Therefore, in Wallstrom's view, "the public does not need to be protected from" him anymore,

so he is "entitled" to "significant" mitigation. *Id.* at 31, 35. Wallstrom's argument is contrary to the record and controlling precedent.

First, as a factual matter, Wallstrom's misconduct did not cease when he repaid King County; it was ongoing at the time of his disciplinary hearing, two years later. As detailed above, when Wallstrom purported to pay GL's settlement funds in December 2014, he underpaid GL by over $500. There is no indication GL ever received his full share of the settlement, and Wallstrom does not challenge the hearing officer's recommended sanction of restitution to GL, with interest accruing as of December 2014. Although the failure to promptly pay client funds was not Wallstrom's most serious misconduct, the fact that *any* misconduct was still occurring at the time of his disciplinary hearing weighs heavily against his request for extraordinary mitigation based on the passage of time.

Second, as Wallstrom recognizes, his argument is precluded as a matter of law. This court recognizes a delay mitigator pursuant to ABA *Standards* std. 9.32(j), but we have held "in case after case" that it applies only "when the respondent attorney is able to establish that the proceeding's time span resulted in unfair prejudice to [them], or is caused by unjustified prosecutorial delay." *Preszler*, 169 Wn.2d at 33 (citing *In re Disciplinary Proceeding Against Kronenberg*, 155 Wn.2d 184, 196-97, 117 P.3d 1134 (2005); *In re Disciplinary Proceeding Against Anschell*, 149 Wn.2d 484, 515, 519, 69 P.3d 844 (2003); *In re*

*Disciplinary Proceeding Against Cohen*, 149 Wn.2d 323, 341, 67 P.3d 1086 (2003); *In re Disciplinary Proceeding Against Kagele*, 149 Wn.2d 793, 72 P.3d 1067 (2003); *In re Disciplinary Proceeding Against Huddleston*, 137 Wn.2d 560, 576, 974 P.2d 325 (1999)). Thus, delay may be a mitigating circumstance when it is "the result of administrative understaffing and slack prosecution" by the WSBA, but it is "more difficult to meet when the attorney plays a role in extending the length of time in the proceeding." *In re Disciplinary Proceeding Against Tasker*, 141 Wn.2d 557, 568, 9 P.3d 822 (2000); *Preszler,* 169 Wn.2d at 33.

In Wallstrom's case, it is undisputed that "[t]here was no prosecutorial delay by ODC" and that Wallstrom "was not prejudiced unfairly by the length of the proceeding." CP at 88. It is also undisputed that Wallstrom "play[ed] a role in extending the length of the proceedings."[10] *Id.* Therefore, our precedent precludes mitigation based on delay in the proceedings, as the hearing officer and the Board correctly determined.

Nevertheless, Wallstrom argues that "[t]he court has been misapplying Standard 9.32(j) almost from its adoption." Appellant's Opening Br. at 30.

---

[10] Wallstrom argues that "[h]e should not be punished with the loss of the mitigator of delay" because he "asked for two continuances" of the disciplinary hearing only "when his wife was very ill." Appellant's Opening Br. at 32. This is an incomplete description of the delays that occurred in this case. As detailed above, Wallstrom significantly extended the length of ODC's investigation due to his poor recordkeeping and then repeatedly delayed resolution of the disciplinary proceeding, for example, bypassing ELC 10.16(c) and appealing directly to the Board solely to remand for additional findings on presumptive sanctions.

According to Wallstrom, the delay mitigator "has nothing to do with prejudice to the attorney or undue delay by the system." *Id.* To support this view, he cites "two cases cited by the [ABA] Standards," a 1974 California opinion and a 1983 Florida opinion. *Id.* at 25-26 (citing *Yokozeki v. State Bar*, 11 Cal. 3d 436, 521 P.2d 858, 113 Cal. Rptr. 602 (1974); *Fla. Bar v. Thomson*, 429 So. 2d 2 (Fla. 1983)). Because these two opinions did not explicitly require prejudice or prosecutorial delay before applying delay as a mitigator, Wallstrom argues those factors should never be required.

The respondent attorney in *Preszler* made the same argument, citing the same cases.[11] *See* Opening Br. of Resp't Preszler, *In re Disciplinary Proceeding Against Preszler*, No. 200,570-5, at 31 (Wash. 2008) (citing *Yokozeki*, 11 Cal. 3d 436; *Thomson*, 429 So. 2d 2). *Preszler* rejected this argument. 169 Wn.2d at 35-36. Wallstrom disagrees with *Preszler*, but he does not show it is incorrect and harmful or its legal underpinnings have changed or disappeared. To the contrary, *Preszler* was supported by years of precedent when it was decided, and Wallstrom does not point to any subsequent changes in law that could have undermined its analysis. Thus, Wallstrom shows no basis to revisit our precedent.

Moreover, although Wallstrom cites opinions from California and Florida, he fails to acknowledge more recent precedent from those states holding that delay

---

[11] Wallstrom's counsel in this case also represented the respondent attorney in *Preszler*.

is *not* a mitigator unless the lawyer shows "specific prejudice." *Fla. Bar v. Bander*, 361 So. 3d 808, 817-18 (Fla. 2023); *see also Blair v. State Bar*, 49 Cal. 3d 762, 774, 781 P.2d 933, 263 Cal. Rptr. 641 (1989). Many other jurisdictions take a similar approach, consistent with our opinion in *Preszler*. *E.g.*, *In re Howes*, 52 A.3d 1, 18 n.22 (D.C. 2012) (no mitigation for lengthy but nonprejudicial delay); *Att'y Grievance Comm'n v. Jackson*, 477 Md. 174, 219, 269 A.3d 252 (2022) (applying delay mitigator due to prejudicial effect); *In re Gross*, 435 Mass. 445, 451, 759 N.E.2d 288 (2001) (no mitigation for delay absent substantial prejudice); *In re Wern*, 431 S.C. 643, 650, 849 S.E.2d 898 (2020) (unjustified delay is a mitigator only where it results in unfair prejudice); *Harris v. Bd. of Pro. Resp.*, 645 S.W.3d 125, 140-41 (Tenn. 2022) (no mitigation for agreed-on delay).

Thus, if Washington "has been misapplying [ABA] Standard 9.32(j) almost from its adoption," as Wallstrom contends, the same is true of many jurisdictions across the country. Appellant's Opening Br. at 30. By contrast, although different "jurisdictions handle delay in disciplinary prosecution in varying ways," Wallstrom does not point to *any* jurisdiction that currently follows his approach. *Wern*, 431 S.C. at 650. We therefore reaffirm that delay in the proceedings can be a mitigating circumstance if, but only if, (1) the delay caused "unfair prejudice" to the respondent attorney or (2) there was "unjustified prosecutorial delay."

*Preszler,* 169 Wn.2d at 33. Neither circumstance is present in this case, so the delay mitigator in ABA *Standards* std. 9.32(j) does not apply.

Apart from the *Standards,* Wallstrom argues that "[t]he impact of the passage of time" must be considered pursuant to ELC 1.4. Appellant's Opening Br. at 25. ELC 1.4 provides, in full, "No statute of limitation or other time limitation restricts filing a grievance or bringing a proceeding under these rules, *but the passage of time since an act of misconduct occurred may be considered* in determining what, if any, action or sanction is warranted." (Emphasis added.) In Wallstrom's view, this language creates a stand-alone mitigator for "the passage of time," with no need to show prejudice or unjustified prosecutorial delay. There is no precedent applying ELC 1.4 in this way, and Wallstrom's reading is contrary to the plain language of the rule.

ELC 1.4 provides that the passage of time "*may* be considered." This discretionary language plainly *allows* for consideration of the passage of time, consistent with our precedent applying the delay mitigator in ABA *Standards* std. 9.32(j). However, nothing in ELC 1.4 *requires* mitigation based *solely* on the passage of time, as Wallstrom contends. To the contrary, by expressly rejecting any statute of limitations for attorney discipline, ELC 1.4 strongly indicates that the passage of time, in itself, should not be determinative. Holding otherwise

would effectively create a de facto statute of limitations for attorney misconduct, contrary to ELC 1.4's plain language.

Nevertheless, Wallstrom argues that the "passage of time" should be a per se mitigating circumstance where an attorney commits serious misconduct warranting disbarment but "continues to represent people without ethical problems" before sanctions are imposed. Appellant's Opening Br. at 31. He argues this "passage of time, without additional misconduct," proves that "the public does not need to be protected from this particular lawyer," precluding disbarment. Appellant's Reply Br. at 4; Appellant's Opening Br. at 31. Wallstrom also emphasizes that ODC "has never moved, pursuant to ELC 7.2(a)(1), for an interim suspension," which Wallstrom interprets as "tacit recognition that [he] does not really represent a risk to the public." Appellant's Opening Br. at 34. Wallstrom does not clearly define the parameters of his proposed "passage of time" mitigator, but he suggests that "five years is the outside limit in which misconduct should be considered" by analogy to attorney admissions cases. *Id.* at 32 (citing WASH. STATE BAR LICENSURE TASK FORCE SUBCOMM. ON ETHICS/CHARACTER FITNESS, REPORT AND RECOMMENDATIONS 22-23 (May 24, 2023)).

Every aspect of Wallstrom's argument is contrary to controlling law. This court has already held, on multiple occasions, "that '[e]nding misconduct does not erase . . . that misconduct which has already occurred.' Likewise, engaging in

appropriate conduct most of the time does not eradicate prior disciplinary infractions from an attorney's record." *Kuvara*, 149 Wn.2d at 253 (alterations in original) (citation omitted) (quoting *In re Disciplinary Proceeding Against Dann*, 136 Wn.2d 67, 83-84, 960 P.2d 416 (1998)). Wallstrom shows no basis to revisit this sound reasoning. We therefore reaffirm, consistent with the views of other jurisdictions, that "[t]he absence of ethical violations is the norm that is to be expected of any attorney. It is not a mitigating factor that would justify a significant reduction in sanction." *Gross*, 435 Mass. at 452.

Controlling precedent also correctly rejects Wallstrom's argument "that an interim suspension is a prerequisite to disbarment." *Kronenberg*, 155 Wn.2d at 197 n.9. ELC 7.2 provides that a petition for interim suspension *may* be filed where an attorney presents "a substantial threat of serious harm to the public," but *must* be filed "[w]hen the Board enters a decision recommending disbarment."[12] ELC 7.2(a)(1)(A), (a)(2). Yet, under Wallstrom's interpretation, the latter provision is superfluous because no attorney could be recommended for disbarment unless they were already subject to an interim suspension petition. We must avoid interpreting ELC 7.2 "in a way that renders any portion of it

---

[12] "When the Board enters a decision recommending disbarment, . . . [t]he respondent must be suspended absent an affirmative showing that the respondent's continued practice of law will not be detrimental to the integrity and standing of the bar and the administration of justice, or be contrary to the public interest." ELC 7.2(a)(2).

meaningless or superfluous." *Kellogg v. Nat'l R.R. Passenger Corp.*, 199 Wn.2d 205, 221, 504 P.3d 796 (2022). Therefore, we reaffirm that Wallstrom's interim suspension argument is "without merit." *Kronenberg*, 155 Wn.2d at 197 n.9.

In addition, we have already rejected Wallstrom's proposed analogy between attorney discipline and new attorney admissions. New applicants for admission to the bar "do not have previous lawful experience as independently practicing attorneys," in direct contrast to licensed attorneys who commit serious misconduct warranting disbarment. *In re Bar Application of Simmons*, 190 Wn.2d 374, 388, 414 P.3d 1111 (2018). Moreover, even in the admissions context, Wallstrom's proposed "five-year rule" does not exist. A similar rule has been proposed, but the court has not yet acted on the proposal, and our current precedent expressly "decline[s] to adopt a specific time period as evidence of complete rehabilitation for all applicants." *Id.* at 387.

Finally, although Wallstrom repeatedly invokes "the purposes of lawyer discipline," his proposed mitigator for the "passage of time" would directly undermine these purposes. Appellant's Opening Br. at 35. We cannot "protect the public" if we adopt a per se mitigator based solely on the passage of time because the "[c]onduct of a lawyer, no matter when it has occurred, is always relevant to the question of fitness to practice." *Kelley*, 3 Wn.3d at 565; AM. BAR ASS'N, MODEL RULES FOR LAWYER DISCIPLINARY ENFORCEMENT cmt. to R. 32, at 57

(2007). Similarly, if we hold that an attorney can steal from their clients and then avoid disbarment by keeping inaccurate financial records and delaying resolution of the disciplinary proceeding, as occurred here, we cannot hope to "deter other attorneys from similar misconduct" or "preserve confidence in the legal system." *Kelley*, 3 Wn.3d at 565; *Fossedal*, 189 Wn.2d at 241.

In sum, the hearing officer and the Board correctly concluded that delay is not an applicable mitigating circumstance in accordance with this court's precedent. We adopt their unanimous conclusion, and we reject Wallstrom's argument that ELC 1.4 creates a stand-alone mitigator for the passage of time.

      b.    The applicable mitigating circumstances are not extraordinary

Although delay is not an applicable mitigator in this case, the hearing officer found other mitigating circumstances, including absence of a prior disciplinary record, personal and emotional problems, and remorse. CP at 86 (citing ABA ANNOTATED STANDARDS std. 9.32(a), (c), (*l*) at 487). Nevertheless, the hearing officer determined, and the Board unanimously agreed, that these mitigators are not sufficiently "'extraordinary'" to warrant a departure from the presumptive sanction of disbarment. *Fossedal*, 189 Wn.2d at 234 (quoting *Schwimmer*, 153 Wn.2d at 760). Wallstrom argues that the Board did not give sufficient weight to the mitigating circumstances in this case. We adopt the Board's unanimous decision.

First, Wallstrom contends that his absence of a prior disciplinary record should be highly mitigating because he "practiced without incident for 36 years," and "there is every reason to believe he can do so again." Appellant's Opening Br. at 36. In other words, Wallstrom appears to argue this factor should be weighted more heavily in *mitigation* because it is paired with the *aggravating* factor of substantial experience in the practice of law. *See* ABA ANNOTATED STANDARDS std. 9.22(i) at 451. We reject this view and adopt the hearing officer's conclusion that "[a]ttorneys cannot shield themselves from the consequences of a serious ethical violation just because the violation happens to be a first offense." CP at 86 (citing *Schwimmer*, 153 Wn.2d at 763).

Next, Wallstrom argues that the hearing officer "disrespected" his personal and emotional problems by concluding this factor should "be given little weight" in mitigation. Appellant's Opening Br. at 37; CP at 86. To be sure, attorneys going through the disciplinary process are entitled to respect, and their personal problems should not be minimized. However, the respect an attorney is owed as an *individual* is distinct from the mitigation they should receive in the *professional consequences* of their misconduct. *See Fossedal*, 189 Wn.2d at 235. Where an attorney steals from their clients, as Wallstrom did, the professional consequence is disbarment, absent extraordinary mitigation. *Id.* at 234.

It is undisputed that Wallstrom's personal and emotional problems did not cause his misconduct or prevent him from distinguishing between right and wrong. Moreover, the types of problems Wallstrom describes (alcohol abuse[13] and illness in his family), though serious, are not necessarily once-in-a-lifetime events. Similar problems could arise in the future, and every attorney must be prepared for the possibility that their personal circumstances may overwhelm their professional responsibilities. Yet, Wallstrom does not point to any new strategies he has implemented to avoid repeating his prior misconduct, should personal problems arise again. To the contrary, at the time of his disciplinary hearing, Wallstrom was "still not clear" on how to properly reconcile his trust account. 3 VRP (Aug. 18, 2022) at 434. Wallstrom's personal and emotional problems do not establish extraordinary mitigation.

In addition, Wallstrom emphasizes his remorse, "as it shows his understanding of the issues and his acceptance of responsibility." Appellant's Opening Br. at 37. However, in the same brief, Wallstrom dismissively describes his intentional theft of over $12,500 from two different clients as a "relatively small dollar amount." *Id.* at 18. Thus, Wallstrom may have shown remorse for

---

[13] Although Wallstrom's past alcohol abuse is relevant to his personal and emotional problems, the hearing officer determined that the mitigator for mental disability or chemical dependency does not apply because Wallstrom "offered no medical testimony to establish that alcoholism affected [his] moral judgment" or caused any of his misconduct. CP at 87 (citing ABA ANNOTATED STANDARDS std. 9.32(i) at 487). This determination is not challenged on appeal.

"the inadequacy of [his] financial record keeping," but he clearly does *not* fully understand or accept responsibility for the harm he caused. CP at 86. We adopt the Board's unanimous conclusion that remorse and the other applicable mitigating circumstances are not sufficiently extraordinary to warrant a departure from the presumptive sanction of disbarment in this case.

     c.     Additional mitigators do not apply

Finally, Wallstrom argues he is entitled to mitigation for additional reasons beyond those found by the hearing officer. We reject these arguments.

Wallstrom asks the court to apply the mitigator for full and free disclosure and a cooperative attitude toward the proceedings. *See* ABA ANNOTATED STANDARDS std. 9.32(e) at 487. This mitigator "applies only 'in situations where an attorney goes *above and beyond*'" what is required of them "because '[i]t is the duty of every attorney to cooperate with a bar investigation.'" *Preszler*, 169 Wn.2d at 31-32 (alteration in original) (quoting *In re Disciplinary Proceeding Against Trejo*, 163 Wn.2d 701, 732, 185 P.3d 1160 (2008); *Johnson*, 114 Wn.2d at 747); *see* RPC 8.4(*l*); ELC 1.5. Wallstrom argues this mitigator applies because he "recognized" and "admitted" some of his misconduct. Appellant's Opening Br. at 37-38. He does not specify which misconduct or when he admitted to it. However, given that much of Wallstrom's misconduct is indisputably clear from

his own financial records, the fact that he admitted to some of the misconduct, at some point in the proceedings, is not a mitigating circumstance in this case.

Wallstrom also appears to request mitigation based on his assessment of the level of injury he caused, asserting that his theft of client trust funds involved a "relatively small dollar amount." *Id.* at 18. However, "the actual or potential injury caused by the lawyer's conduct" is not a mitigating circumstance; it is part of the inquiry to determine the presumptive sanction. *Kelley*, 3 Wn.3d at 551; *see* ABA ANNOTATED STANDARDS std. 9.32, at 487. As discussed, it is undisputed that the presumptive sanction is disbarment, based in part on the hearing officer's unchallenged finding that Wallstrom's misconduct "caused serious injury to the rightful owners of the converted funds and potential injury to the legal system." CP at 82.

Indeed, regardless of the dollar amount involved, the administration of justice "is harmed every time a trust account is misused." *Simmerly*, 174 Wn.2d at 990. The public must be able to have "trust and confidence in trust accounts" because such accounts "are essential to the way lawyers conduct their clients' business." *Id.* Therefore, every time an attorney draws on their trust account as a "piggy bank" or a "rainy day fund" to cover expenses, that attorney undermines a foundational aspect of the legal system. Wallstrom's belief that over $12,500 is a

"relatively small" amount to steal from client funds in his trust account is not a mitigating circumstance.

Finally, Wallstrom asks the court to "'weigh[ ] the nature of the misconduct against the hardships imposed on the attorney,'" pointing to his age and his ill family members. Appellant's Opening Br. at 38 (quoting *Noble*, 100 Wn.2d at 96). As discussed above, this is one of the *Noble* factors we long ago rejected as "superfluous" because the framework of the ABA *Standards* "ensure[s] that the sanction imposed on an attorney is not clearly excessive." *Kuvara*, 149 Wn.2d at 258. Disbarment is not a clearly excessive sanction for Wallstrom's repeated, intentional theft of client funds, and sympathy for his personal circumstances cannot outweigh the harm caused by his misconduct.

In sum, the second stage of our three-stage analysis supports the presumptive sanction of disbarment because there are multiple, unchallenged aggravating circumstances and no extraordinary mitigators. As to the third stage of our analysis, the Board's recommendation is unanimous, and Wallstrom does not argue that disbarment "is disproportionate to other cases involving similar conduct." *Kelley*, 3 Wn.3d at 566. Thus, there are no "specific reasons for adopting a different sanction, [and] we will adopt the sanction recommended by the Board." *Id.* at 551.

CONCLUSION

In accordance with our precedent, disbarment is the appropriate sanction for Wallstrom's many ethical violations, including the knowing and intentional theft of client funds from his trust account. Wallstrom shows no basis to depart from our precedent or the Board's unanimous recommendation. Therefore, we adopt the Board's recommended sanction of disbarment and restitution to GL.

_____
Yu, J.

WE CONCUR:

_____
Stephens, C.J.

_____
Gordon McCloud, J.

_____
Johnson, J.

_____
Montoya-Lewis, J.

_____
Madsen, J.

_____
Whitener, J.

_____
González, J.

_____
Mungia, J.